# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

2004 JUL 16  AM 9: 20

CLARENCE HADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

LARKIN COMMUNITY HOSPITAL, INC.,
A Florida Corporation; DR. JACK J. MICHEL,
Personally and individually; DR. GEORGE J.
MICHEL, personally and individually; and,
ORACLE HEALTH SYSTEMS, INC., a
Florida Corporation,

        Plaintiffs,

vs.

TIM BYRNES, individually for acts done
in his official capacity as Chief of Medicaid
Program Integrity, of the FLORIDA AGENCY
FOR HEALTH CARE ADMINISTRATION, and,
ALAN LEVINE, individually for acts done
in his official capacity as Secretary of the FLORIDA
AGENCY FOR HEALTH CARE ADMINISTRATION,
and, the FLORIDA AGENCY FOR HEALTH CARE
ADMINISTRATION, a governmental agency,

        Defendants.

_____/

GENERAL CIVIL DIVISION

CASE NO.

# 04-21752

## CIV - GOLD

MAGISTRATE JUDGE
SIMONTON

## COMPLAINT

Plaintiffs sue Defendants and say:

1. This is an action for Declaratory and Injunctive Relief.

## JURISDICTION AND VENUE

2.      This is a civil action involving the Medicaid Act, 42 U.S.C. § § 1396 *et seq.*, the

Declaratory Judgment Act, 28 U.S.C. § § 2201-02, and 42 U.S.C. § 1983. This Court has

1



Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
--------------------------------------------

jurisdiction of this action under 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C.

§ 1391(b).

## PARTIES

3.      LARKIN COMMUNITY HOSPITAL, INC., ("Larkin"), is a Florida Corporation,

lawfully existing and maintaining its principal place of business within Miami-Dade County, Florida,

and is and has been a provider under the Florida Medicaid program.  Larkin, a South Miami based

community Hospital, has been providing health treatment, services, care and community

involvement for the greater thirty (30) years.  In all of this time, Larkin has been a provider with the

Florida Medicaid program.  Larkin is a (130) bed Acute Care General Hospital.  Larkin is composed

of (82) Acute care beds, (8) intensive care beds, (40) psychiatric beds and a (24) hour emergency

room open to the public and fire rescue.

4.      DR. JACK J. MICHEL, (J. Michel), is a Miami based physician and is and has been

a provider under the Florida Medicaid program since 1993.  Dr. J. Michel is also the majority owner

and C.E.O. of Larkin Community Hospital as well as with his own healthcare group practice, to wit:

Oracle Health Systems, Inc.

5.      DR. GEORGE J. MICHEL, ("G. Michel"), is a Miami based physician and is and has

been a provider under the Florida Medicaid program since 1993.  G. Michel is and has been a

physician/employee with Oracle Health Systems, Inc.

2

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
-------------------------------------

6.      ORACLE HEALTH SYSTEMS, INC., ("Oracle"), is a Florida Corporation,

lawfully existing under the laws of Florida and maintaining its principle place of business within

Miami-Dade County, Florida. Oracle has been functioning as a medical group practice under its

owner, i.e., Dr. J. Michel, since 1997.  Oracle is and has been a provider under the Florida

Medicaid program since 1997.

7.      Defendant, Tim Byrnes, is the Chief of Medicaid Program Integrity of the Florida

Agency for Health Care Administration ("AHCA") and is sued in his official capacity and is sui

juris.

8.      Defendant Alan Levine, is Secretary of the Florida Agency for Health Care

Administration ("AHCA") and is sued in his official capacity and is sui juris.

9.      Defendant, Florida Agency for Health Care Administration, ("AHCA"), is a

cooperative State of Florida-Federal program which provides medical assistance to needy persons,

and which provides reimbursement for certain services provided by privately - owned nursing

facilities, medical offices, physicians, and hospitals, including but not limited to the Plaintiffs.

Defendant, AHCA, is sui juris.

## FACTUAL BACKGROUND

10.     On or about July 29, 2004, the United States of America Department of Justice

("United States") filed a civil suit against Plaintiffs and other entities and individuals not parties to

this action alleging civil violations of the False Claims Act, 31 U.S.C. § § 3729-33 based on two

alleged schemes to defraud the United States in connection with services rendered under the

3

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
-----------------------------------------

Medicaid and Medicare programs. It is important to note that at this juncture the United States has **NOT served** any of the defendants to this lawsuit, and had it not been for a press release by the government, the defendants may not have learned of this filing. The alleged schemes to defraud occurred from 1997 through 1999. See, *United States of America v. Jack Jacobo Michel, M.D., et al.,* United States District Court Southern District of Florida, Case No.: 04-21579 CIV-JORDAN.

11.    With respect to the instant Plaintiffs, the False Claims Act Complaint is based on unsupported, unfounded and conclusory allegations of purported fraud that fail to comply with Rule 9 of the Federal Rules of Civil Procedure, which requires that fraud be pled with specificity. A copy of the False Claims Act Complaint is attached hereto as Exhibit "A". The subject False Claims Complaint first concerns itself with FY 1997, at which time Dr. Jack Michel was only a minority owner and had no decision making abilities at the hospital. In 1997, Dr. Desnick (who is not a party to this suit was the majority owner and controller of Larkin). At No time material hereto were Dr. George Michel nor Oracle Health Systems ever an owner of Larkin.

12.    There is no specific allegation that any of the instant Plaintiffs improperly billed the Medicaid program. To the contrary, the only allegation is that the Federal Government believes that out of the monies paid to Larkin by the Medicaid Program, at least half of that was from Federal monies. The False Claims Complaint does elude to the possibility that Medicaid paid for claims which were not medically necessary or reasonable. However, NO specifics are plead.

13.    Additionally, the Federal False Claims Act Complaint focuses on wrongdoing, during year 1997. In 1997 Larkin was owned and operated by another third party who is not a party to this law suit, i.e., Dr. James Desnick. In April of 1998, Dr. Jack Michel's complete purchase of Larkin

4

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
----------------------------------------

became effective.

14.     The day after the United States filed its False Claims Act Complaint, AHCA notified Plaintiffs of its decision to temporarily withhold Medicaid payments pursuant to Florida Statute § 409.913(24)(a) and 42 C.F.R. § 455.23 based on allegedly "reliable evidence" that the Plaintiffs were engaged in fraudulent practices *under the Medicaid program*. Copies of the notices sent by AHCA (collectively, "the AHCA Notices") to Plaintiffs are attached hereto as Exhibit "B".

15.     The AHCA Notices identified the general basis for temporarily withholding Plaintiffs' respective Medicaid payments as "the filing of a false claims action against Plaintiffs." The AHCA Notices further advised that the withholding of Medicaid payments would end if and when it were determined insufficient evidence of fraud by Plaintiffs existed, or when legal proceedings related to the alleged fraud were completed. *Id.*

16.     Significantly, the AHCA's Notices do not disclose that AHCA has conducted its own investigation into the conduct, or independently reviewed the evidence, which allegedly supports the False Claims Act Complaint to determine whether that evidence is, in fact, reliable. In fact, upon receipt of said AHCA Notices, the undersigned contacted AHCA, specifically Kelly Bennett, Assistant Bureau Chief, in order to inquire why AHCA took such unilateral and severe actions against the undersigned's clients. Ms. Bennett informed the undersigned that AHCA's actions arose from the Federal False Claims Act lawsuit filed against the same.

17.     Moreover, AHCA's decision to withhold *current* Medicaid payments to Plaintiffs is based on alleged fraud which, according to the United States False Claims Complaint upon which AHCA's decision rests, occurred years earlier - from 1997 through 1999. Accordingly, the basis for

5

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
---------------------------------------------

withholding *current* Medicaid payments has nothing to do with the present conduct of Plaintiffs, but rather is premised on alleged acts of fraud which allegedly occurred years ago.

18.     Finally and importantly, the AHCA Notices do not claim that any of the Plaintiffs are *currently* in a state of non-compliance with any of requirements set forth in the Medicaid Act, or that any of the instant Plaintiffs are currently engaged in allegedly fraudulent practices under the Medicaid program.

19.     The AHCA Notices advised Plaintiffs of their right to "informally present" their position to AHCA in writing within a certain time period.  On July 7, 2004 through the present, Plaintiffs advised AHCA of their position, and requested that AHCA refrain from taking any action against Plaintiffs as well as meeting between the parties so as to explore this matter further and review exculpatory evidence.

20.     At time of filing this Complaint, the Plaintiffs have yet to hear from AHCA concerning whether AHCA intends to continue withholding Medicaid payments.

21.     AHCA's action violates the federal Medicaid Act and its corresponding regulations, and also violates Plaintiffs' constitutional right to Due Process of law.  Unless the Court enjoins AHCA's unlawful action, Plaintiffs will be irreparably harmed, communities will be disrupted, and hundreds, if not thousands, of patients and their families will be exposed to the irreparable injury that will occur if the Plaintiffs must close their doors, thereby requiring the involuntary relocation and discontinuation of patient care.

6

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
------------------------------------------

## STATUTORY AND REGULATORY BACKGROUND

22.     The Medicaid Program is a cooperative state-federal program which provides medical assistance to needy persons, and which provides reimbursement for certain services provided by various healthcare providers, including but not limited to the Plaintiffs' as physicians, physician offices and hospitals.

23.     Individuals who are obtaining Medicare and/or Medicaid benefits must do so as a result of eligibility. An example of eligibility for the Medicaid program concerns one of economics; while with the Medicare program it concerns age and/or disability issues.

24.     States such as Florida that have chosen to participate in the Medicaid Program are required to administer their state Medicaid Programs in accordance with the Federal Medicaid Act, 42 U.S.C. § § 1396 *et seq.*, its implementing regulations, which are scattered throughout Volume 42 of the Code of Federal Regulations, and various manuals promulgated by the Secretary of the U.S. Department of Health and Human Services ("the Secretary") and the Health Care Financing Administration ("HCFA"), a subdivision of the Department of Health and Human Services.

25.     The Medicaid Act and its accompanying regulations contain detailed enforcement provisions that authorize the Secretary and/or a participating State to impose a variety of remedies for failure to comply with Medicaid requirements. *See* 42 U.S.C. § 1396r. The purpose of those remedies is to ensure prompt compliance with Medicaid requirements.

26.     In addition to the specific compliance requirements set forth in the Medicaid Act, the Medicaid Act furthermore requires all providers to "operate and provide services in compliance with all applicable Federal . . . laws and regulations." *See* 42 U.S.C. § 1396r(d)(4)(A).

7

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
-----------------------------------------

27.     The Medicaid Act provides that remedies available to ensure compliance with Medicaid's requirements include, *inter alia,* termination of the facility's Medicaid provider agreement, imposition of civil monetary penalties, denial of payment for new admissions, directed plans of correction, and temporary management. *See* 42 U.S.C. § 1396r(h), 42 C.F.R. § 488.400 *et seq.*

28.     To combat Medicaid fraud, the federal regulations require that a State's Medicaid Agency establish methods and criteria for identifying suspected fraud cases, and implement methods of investigating such cases in a manner which does not infringe on the legal rights of the person's involved and affords Due Process of law. *See* 42 C.F.R. § 455.13.

29.     If a state Medicaid Agency receives a complaint of Medicaid fraud from any source or identifies questionable practices, *it* (and not some other entity) must conduct a preliminary investigation to determine whether there is sufficient basis to warrant a full investigation. *See* 42 C.F.R. § 455.14.

30.     If the findings of the preliminary investigation give the State Medicaid Agency reason to believe that an incident of fraud has occurred in the Medicaid program, the agency must refer the matter to that State's certified Medicaid Fraud Control Unit. *See* 42 C.F.R. § 455.15.  The State of Florida has a Medicaid Fraud Control Unit. *See* Fla. Stat. § 409.913.

31.     If the State Medicaid Agency's investigation identifies "reliable evidence" of fraud *under the Medicaid program*, then the State Medicaid Agency may withhold Medicaid payments, in whole or in part, to a provider until the State agency or prosecuting authorities determine there is insufficient evidence of fraud by the provider, or once legal proceedings related to the provider's

8

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
----------------------------------------

alleged fraud are completed.  *See* 42 C.F.R. § 455.23.  (This is the provision upon which ACHA has

based its current actions as to Plaintiffs).

## IRREPARABLE INJURY

32.     Plaintiffs have a fiduciary duty, imposed by federal and state regulations, statutes and

the common law, to protect the health and safety of the patients they care for, treat and service as a

hospital, a medical office as well as physicians.

33.     AHCA's decision to withhold Medicaid payments to Plaintiffs will result in

tremendous disruption of patient continuity of care.  Suspension of Medicaid payments will cause

Plaintiffs to be unable to meet their financial obligations and will result in a reduction of services,

care and treatment.  In some cases, some of the Plaintiffs may be required to close their facilities

completely.  Furthermore, the cost to the Medicaid program and State of Florida as a direct and

proximate result of this disruption is enormous.  Patients would have to seek out new health care

providers or be transferred to a new hospital setting.  Health care, mentally and physically, would

be endangered.  New health providers would require new tests, procedures and expenses to be

undertaken by these victimized patients.  These patients would be subject to un-necessary tests and

procedures and the Medicaid Program would have to bear the costs of such tests and procedures.

34.     The reduction in services and/or the closure of facilities caused by the suspension of

Medicaid payments will necessitate the involuntary transfer of elderly, frail, and infirm patients to

other facilities.  Many of the patients to whom Plaintiffs provide care consider the Plaintiffs'

respective facilities their best hope of survival.  Important to note is that Larkin Community Hospital

is the communities best source of care, treatment and service to the elderly, frail, infirm and Latin

9

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
--------------------------------------------

population in which it serves. Larkin has built up a specialty to treating this patient population. This specialty care has not been adopted by the surrounding hospitals. In furtherance thereto, Dr. Jack and George Michel have become geriatric specialists and considered some of the best the community has to offer.

35.     The involuntary transfer of elderly and infirm residents – even if well planned and executed – puts every such patient at risk of "transfer trauma", a well-documented and accepted clinical condition that is characterized by disorientation, loss of appetite, increased agitation and various other physical manifestations. In extreme cases, transfer trauma can lead to illness or even premature death.

36.     Withholding of Plaintiffs' Medicaid payments will cause them irreparable harm because the temporary loss of Medicaid funding will prevent them from operating their facilities in compliance with Federal and Florida laws and regulations, and force them to reduce services to their various patients. Ultimately, the Plaintiffs' irreparable harm will be passed onto the patients who are in dire need of their care, treatment and services, who will have to relocate to other hospitals to ensure they receive the attention they require to survive.

## COUNT I -- VIOLATION OF THE MEDICAID ACT

37.     Plaintiffs re-allege paragraphs 1 through 36 as if set forth in full.

38.     Defendants' AHCA, Tim Byrnes and Alan Levine have violated the Medicaid Act by purporting to suspend Medicaid payments to Plaintiffs based solely on vague allegations contained in the False Claims Act Complaint.

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
------------------------------------------------

39.     Defendants' AHCA, Tim Byrnes and Alan Levine's failure to independently compile, review, and assess the evidence which allegedly gives rise to circumstances involving fraud under the Medicaid program to determine whether it is, in fact, reliable evidence sufficient to justify withholding Plaintiffs' Medicaid payments constitutes a violation of the procedures set forth in 42 C.F.R. § 455.13-.23.

## COUNT II – VIOLATION OF THE MEDICAID ACT

40.     Plaintiffs re-allege paragraphs 1 through 36 as if set forth in full.

41.     Defendants' AHCA, Tim Byrnes and Alan Levine have violated the Medicaid Act by withholding Medicaid payments for current services furnished by Plaintiffs even though Plaintiffs are currently in substantive compliance with all requirements set forth in the Medicaid Act.

42.     Defendants' AHCA, Tim Byrnes and Alan Levine are prohibited under the Medicaid Act from withholding Medicaid payments from providers that are in current compliance with the Medicaid Acts's requirements based solely on allegations that Plaintiffs were not in compliance with the Medicaid Act's requirements during a previous period or periods, namely, 1997 through 1999.

## COUNT III – VIOLATION OF THE MEDICAID ACT

43.     Plaintiffs re-allege paragraphs 1 through 36 as if set forth in full.

44.     Defendants' AHCA, Tim Byrnes and Alan Levine have violated the Medicaid Act by withholding Medicaid payments for current services furnished by Plaintiffs, where no specific showing of Medicaid fraud has been committed based on allegations of fraud under the Medicaid program which allegedly occurred from 1997 through 1999.

45.     Defendants' AHCA, Tim Byrnes and Alan Levine are prohibited under the Medicaid

11

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
--------------------------------------------

Act from withholding Medicaid payments from providers based on allegations of fraud under the

Medicaid program where no specific proof has been demonstrated or plead.

## COUNT IV -- ARBITRARY AND CAPRICIOUS ACTION

46.     Plaintiffs re-allege paragraphs 1 through 36 as if set forth in full.

47.     Defendants' AHCA,  Tim Byrnes and Alan Levine decision to withhold Medicaid

payments based on allegedly "reliable" evidence of alleged fraud and which evidence has neither

been independently reviewed, considered, or assessed by AHCA constitutes arbitrary and capricious

action, and is not otherwise in accordance with law.

## COUNT V - VIOLATION OF DUE PROCESS OF LAW

48.     Plaintiffs re-allege paragraphs 1 through 36 as if set forth in full.

49.     Defendants' AHCA, Tim Byrnes and Alan Levine decision to provide Plaintiffs with

only an informal opportunity to contest AHCA's decision to withhold Medicaid payment when a full

administrative hearing is required prior to the withholding of any Medicaid payments violates

Plaintiffs' constitutional rights to Due Process of Law under the 14th Amendment.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court:

A.     Declare that Defendants' AHCA, Tim Byrnes and Alan Levine decision to withhold

Plaintiffs' Medicaid payments as unlawful because it exceeds his authority under the Medicaid Act

and accompanying regulations.

B.     Declare that Defendants' AHCA, Tim Byrnes and Alan Levine decision to withhold

Plaintiffs' Medicaid payments as arbitrary and capricious;

12

Larkin Community Hospital, et.al.
Vs. AHCA
Case No.
Complaint for Injunctive Relief
-------------------------------------------

  C.  Enjoin Defendants' AHCA, Tim Byrnes and Alan Levine and their agents from taking any action to withhold Plaintiffs Medicaid payments;

  D.  Grant Plaintiffs a full administrative hearing prior to the withholding of any Medicaid payments to contest AHCA's decision in accord with the dictates of Due Process and the relevant laws, regulations and statutes;

  E.  Award Plaintiffs their costs, including reasonable attorney's fees, of this action;

  F.  Grant such other and further relief as the Court may deem reasonable and just.


  Respectfully submitted on this  _13_  day of July 2004, by:


**LAW OFFICES OF CRAIG A. BRAND, P.A.**
(Attorney for Plaintiffs)
Craig A. Brand, Esq.
5201 Blue Lagoon Drive
Suite 720
Miami, Florida 33126
Tel. (305) 263-8221
Fax (305) 263-9221
E-Mail: Craig@LawOfficesofCraigBrand.com



**CRAIG A. BRAND**
FBN: 896111

13



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

# 04-21579

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JACK JACOBO MICHEL, M.D., an
individual; JAMES H. DESNICK, M.D., an
individual; MORRIS ISAAC ESFORMES,
an individual; PHILIP ESFORMES, an
individual; GEORGE MICHEL, M.D., an
individual; FRANCISCO A. PALACIOS, an
individual; CLAUDIA PACE, an individual;
LARKIN COMMUNITY HOSPITAL, INC.,
a Florida corporation; LARKIN HEALTH
SYSTEMS, INC., a Florida corporation;
LARKIN COMMUNITY HOSPITAL, LLC,
a Florida corporation; LARKIN HEALTH
SYSTEMS, LLC, a Florida corporation;
ISLAND TRUST COMPANY, an Illinois
corporation; ORACLE HEALTH
SYSTEMS, INC., a Florida corporation;
MEDICAL MANAGEMENT OF
AMERICA, INC., a Delaware corporation;
HCMA, INC., a Delaware corporation; EMI
ENTERPRISES, INC., an Illinois
corporation; MORPHIL CORP., a Florida
corporation; MORPHIL LLC, a Florida
corporation; MORR-JACK, INC., a Florida
corporation; MORSEY, LC, a Florida
corporation; A.D.M.E. INVESTMENT
CORP., a Florida corporation; A.D.M.E.
INVESTMENT PARTNERS, LTD., a
Florida partnership; ALF HOLDINGS, INC.,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: _____

COMPLAINT OF THE UNITED STATES

CIV-JORDAN

MAGISTRATE JUDGE
BROWN

1   VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(1);
2   VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(2);
3   VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(3);
4   VIOLATIONS OF THE FALSE
   CLAIMS ACT, 31 U.S.C. §
   3729(a)(7);
5   COMMON LAW FRAUD;
6   PAYMENT BY MISTAKE;
7   UNJUST ENRICHMENT; and
8   DISGORGEMENT

Florida partnership, ALF HOLDINGS, INC.  )
Florida corporation; COURTYARD MANOR  )
RETIREMENT LIVING, INC., a Florida  )
corporation; COURTYARD MANOR  )
RETIREMENT INVESTORS, LTD., a  ) )
Florida partnership; COURTYARD MANOR  ) )
RETIREMENT LIVING, LW, a Florida  ) )
corporation; FAIR HAVENS HOLDING  ) )
CO., LLC, a Florida corporation; JENE'S  ) )
RETIREMENT LIVING, INC., a Florida  ) )
corporation;     JENE'S     RETIREMENT  )
INVESTORS  )                                      )
LTD.,   a   Florida   partnership;   JENE'S  )
RETIREMENT   )                                  )
LIVING, LLC, a  Florida corporation; LA  ) )
COVADONGA     RETIREMENT   LIVING,  )
INC.,   )                                        )
a  Florida  corporation; LA COVADONGA  ) )
RETIREMENT INVESTORS, LTD., a Florida  ) )
partnership;     LA     COVADONGA  )
RETIREMENT   )                                  )
LIVING, LW., a  Florida  corporation;  THE  )
POINTE  )                                        )
ETIREMENT LIVING, INC., a Florida  ) )
corporation; THE POINTE RETIREMENT  ) )
INVESTORS, LTD., a Florida partnership;  ) )
THE POINTE RETIREMENT  ) )
LIVING, LW, a Florida corporation;  ) )
RAINBOW RETIREMENT LIVING,  ) )
INC., a Florida corporation; RAINBOW  ) )
RETIREMENT INVESTORS, LTD., a  ) )
Florida partnership; RAINBOW RETIREMENT )
LIVING, LLC, a Florida corporation;  ) )
WILLIAMSBURG RETIREMENT LIVING,  ) )
INC., a Florida corporation;  ) )
WILLIAMSBURG RETIREMENT  ) )
INVESTORS, LTD., a Florida partnership;  ) )
WILLIAMSBURG RETIREMENT LIVING,  ) )
LW., a Florida corporation; MAVEN  ) )
RETIREMENT INVESTORS, LTD., a  ) )
Florida partnership; MAVEN RETIREMENT  ) )
LIVING, INC., a Florida corporation; STATE  ) )
*PARKWAY* ASSOCIATES, LTD., a Florida  )
partnership; RIDGEWAY ASSOCIATES,  ) )
LTD., a Florida partnership; ACLF  )
MANAGEMENT GROUP, INC., a  )

Florida corporation.                          )
                                              )
        Defendants.                           )
_____/

            Plaintiff, the United States of America, alleges as follows:

                                  OVERVIEW

        1.      This is an action brought by the United States to recover damages and civil penalties

under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover all available damages for

common law fraud, payment under mistake of fact, unjust enrichment, and disgorgement. All of

these claims are premised upon the Defendants' false claims and statements submitted or caused to be

submitted in connection with two schemes to defraud the United States Government by submitting

false and fraudulent claims to the Medicare and Medicaid programs.  The first scheme involved

obtaining patient referrals for Larkin Community Hospital (Larkin or the Hospital) by paying

kickbacks and illegal remuneration (collectively kickbacks) to physicians, and by entering into

prohibited financial relationships with physicians, to induce such physicians to refer patients to

Larkin; the bulk of the referrals involved services that were not medically necessary. The second

scheme involved medically unnecessary services.

                               The 1997 Scheme

        2.      The 1997 Scheme involved kickbacks paid by Defendant Larkin Community

Hospital, Inc. (LCH) and its related corporations, as defined below, between on or about March 1,

1997 and December 31, W97. During this period, Defendant James Desnick owned and controlled

Larkin and LCH, and Desnick and LCH paid kickbacks to Defendant Jack Michel and Jack

Michel's practice group (i.e., Defendant Oracle Health Systems, Inc.), in return for the admission of

patients by Jack Michel and Defendant George Michel (who is Jack Michel's brother)

Additionally, Desnick and LCH paid kickbacks to certain other physicians in return for their admissions. Many of these referrals involved medically unnecessary services. This scheme was facilitated through Defendants Frank Palacios, Island Trust Company, Medical Management of America, Inc., and HCMA Inc,, and A.D.M.E. Investment Corp. Ala Oceanside Extended Care, In 1997, patients admitted by Jack Michel and George Michel resulted in approximately 50% of the Medicare payments to Larkin – approximately $4.1 million. Patients admitted by other physicians who were paid kickbacks by Larkin resulted in approximately another 25% of the Medicare payments to Larkin. Medicaid paid Larkin approximately $1 million as a result of the admission of patients by Jack Michel, George Michel and the other doctors at Larkin who were paid kickbacks,

3      The Defendants named in paragraph 2 above used and concealed a variety of illegal arrangements to induce physicians to refer patients to Larkin. Top management and the ownership of Larkin participated in offering and paying kickbacks to physicians, failed to discontinue the unlawful practices even after repeated warnings by their own personnel, and submitted false interim claims and Cost Reports which failed to self disallow the claims made as part of a scheme to pay kickbacks. Larkin and its top management, officers, and shareholders knew that paying kickbacks to and engaging in the prohibited financial relationships with physicians was unlawful; nevertheless, they negotiated, authorized, reviewed, approved and/or failed to rectify the payment of kickbacks and the unlawful financial relationships described in this Complaint.

4.      The Defendants named in paragraph 2 above offered, paid, solicited and/or received kickbacks to physicians in return for patient referrals and engaged in prohibited financial relationships with physicians, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Stark Statute, 42 U.S.C. § 1395nn, and then submitted or caused to be submitted false and/or fraudulent statements or claims to the United States to receive payments for services rendered for such referrals, in violation of the FCA, 31

U.S.C. § 3729(a)(1), (a)(2), (a)(3), and (a)(7).

5.      The Defendants named in paragraph 2 above offered, paid, solicited, or received remuneration in various forms, including (1) checks and cash payments; (2) payments for services allegedly performed by physicians for which there was no signed,, written contract and/or which exceeded fair market value; (3) directorship contracts that provided for payments to physicians required to perform minimal or no duties; (4) salary payments to physicians' employees; and (5) provision of free health care services and medical supplies, including but not limited to adult diapers. Defendants attempted to disguise these payments as legitimate payments for services rendered when, in fact, *they* were payments for physicians' referrals.

### The 1998–1999 Scheme

6.      The 1998-1999 Scheme was implemented from approximately January 1, 1998, when Jack Michel purchased the Hospital from Desnick, to at least December 31, 1999, and involved fraudulently increasing the Larkin patient census and Medicare and Medicaid revenues by churning patients into Larkin from a variety of skilled nursing facilities and assisted living facilities, including but not limited to facilities owned by Defendants Jack Michel, Morris Esformes and Philip Esformes, a, the Retirement Home Defendants (see ¶¶ 25 – 56) for medically unnecessary treatments. The bulk of these patients were admitted by Defendant George Michel, who in 1998 admitted patients which resulted in approximately 50% of the Medicare payments to Larkin.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §¢ 1345 & 1331.

The Defendants reside within and/or are doing and/or previously did business within this District.

## VENUE

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

The Defendants reside within and/or are doing and/or previously did business within this

District.

PARTIES

9,    The United States brings this lawsuit on behalf of its Department of Health and Human

Services (BM).

The Individual Defendant

10.    Defendant Jack Jacobo Michel, M.D. (Jack Michel) is an individual who resides and

does business in Miami, Florida. Jack Michel is a physician who provides services under the Medicare

and Medicaid programs.[1] On March 7, 2003, Jack Michel, LCH, and Oracle Health Systems entered into

an agreement with the United States to waive the statute of limitations for the claims alleged in this action

This agreement has been extended and the current agreement requires that this Complaint be filed on or

before June 30, 2004.

11.    Defendant James H. Desnick, M.D. (Desnick) is an individual who resides in and does

business in Miami, FL. On or about February 28, 1997, Desnick and/or Island Trust Company (Island),

and/or Medical Management of America, Inc. (MMA) — all corporations that Desnick owned and

controlled — purchased Defendant LCH. In or about April 1998, Desnick, Island and/or MMA closed

the sale of the stock of LCH to Jack Michel. In or about January 2004, Desnick entered into an agreement

with the United States to waive the statute of limitations for the claims alleged in this action. This

agreement has been extended and the current agreement requires that this Complaint be filed on or

before June 30, 2004.

_____

Unless otherwise indicated, all allegations relate to times relevant to the allegations.

MIAMI HCE ESQUIRO C4

305 787 6685      P.09

12.      Defendant Morris Isaac Esformes (Moths Esformes) is an individual who resides in Lincolnwood, IL, a suburb of Chicago, and who does business in Miami, FL. Morris Esformes currently *is* an owner of LCH and Fair Havens Holding Co. (Fair Haven), LLC f/k/a LCH LCC. Moths Esformes is actively involved in the daily and financial management of Larkin as well as the Retirement Home Defendants. (reg '1 25 – 56 *infra.*) From April through June in 1997, Moms Esformes was a minority owner of LCH with Desnick and Island. In or about September, 2003, Moths Esformes and Philip Esformes entered into agreements with the United States to waive the statute of limitations for the claims alleged in this action on behalf of themselves and the companies they own and control including, Larkin Community Hospital, LLC, Larkin Health Systems, Inc., Larkin Health Systems LLC, and the Retirement Home Defendants.[2] These agreements have been extended and the current agreements expire on June 30, 2004.

13.      Defendant Philip Esformes is an individual who resides in Miami Beach, FL, and who does business in Miami, FL. Philip Esformes Is the adult son of Defendant Morris Esformes. Philip Esformes is actively involved in the daily and financial management of LCH and the Retirement Home Defendants. & p   i n 25 – 56 *infra.)* Philip Esformes is an officer, director, or indirect manager of at least 33 of the legal entities named as Defendants herein. See ¶ 25 – 55. *infra.*

14.      Defendant George Michel, M.D. (George Michel) is an individual who resides in

[2] The Retirement Home Defendants are; EMI Enterprises, Inc., Morphil Corp., Morphil LLC, Mor-Jack, Inc., Mersey LC, A.D.M.E. Investment Corp, A.D.M.E. Investment Partners, LLC, ALP Holdings, Inc., Courtyard Manor Retirement Living, Inc., Courtyard Manor Retirement Investors. Ltd., Courtyard Manor Retirement Living, LLC, Fair Havens Holding Co. LLC, lends Retirement Living Inc., Jane's Retirement Investors, Ltd., Jene's Retirement Living LLC, La Covadonga Retirement Living, Inc., La Covadonga Retirement Investors, Ltd., La Covadonga Living LLC, The Pointe Retirement Living Inc., The Pointe Retirement Investors, Ltd., The Pointe Retirement Living LLC, Rainbow Retirement Living, Inc., Rainbow Retirement Investors, Ltd., Rainbow Retirement Living, LLC, Williamsburg Retirement Living, Inc., Williamsburg Retirement Investors, Ltd., Williamsburg Retirement Living, LLC, Maven Retirement Living, Inc., Maven Retirement Investors, Ltd., State Parkway Associates, Ltd., Ridgeway Associates, Ltd., and ACIY Management Group, Inc. Stn ¶¶ 25 – 56. There is no specific tolling agreement with ACLF Management Group.

Hialeah, FL and does business in Miami, Florida. George Michel is a physician who provides services under the Medicare and Medicaid programs_ George Michel is the brother of Defendant Jack Michel and practices medicine in Jack Michel's practice group, Oracle Health Systems, Inc. On or about March 3, 2004, George Michel and Frank Palacios entered into agreements with the United States to waive the statute of limitations for the claims alleged in this action. These agreements require that this Complaint be filed on or before June 30, 2004.

15.     Defendant Francisco A. Palacios (Palacios) is an individual who resides in and does business in Miami, FL. Palacios was Jack Michel's business associate and was a patient recruiter for Jack Michel.

16.     Defendant Claudia F. Pace (Pace) is an individual who resides in Miami Lakes, FL and does business in Miami, FL. Pace is a licensed nursing home administrator. Pace was the Administrator of Williamsburg Retirement Living and participated in the scheme to provide Larkin with referrals.

### The Larkin Entities

17.     Defendant Larkin Community Hospital, Inc. (LCH) is a Florida corporation doing business as a 112-bed hospital in Miami, FL located at 7031 SW 62nd Avenue, South Miami, FL. Defendants Desnick, Island, and MMA purchased LCH in February 1997. Through the remainder of 1997, Desnick directly or *through* Island and MMA, his alter egos, owned and controlled LCH. Jack Michel purchased LCH on or about December 31, 1997 from Defendants Desnick, MMA, and Island and certain other vests created for the Desnick family. (Despite the announcement of the sale on December 31, 1997, the transaction did not close until April 1998.) In about June 2000, Morris Esformes purchased or otherwise obtained a 49 percent interest in LCH. LCH currently is owned and controlled, directly or indirectly, by Jack Michel, Philip Esformes, Morris Esformes and other members of the Esformes family. LCH is one of the Defendants collectively referred to as Larkin in this Complaint.

18.     Larkin Community Hospital, LLC (LCH LLC), is a Florida limited liability

corporation incorporated in April 2000. LCH LLC's last known business address is 3737 West Arthur Avenue, Lincolnwood, IL 60712. The managing member of LCH LLC is Larkin Health Systems, LW, LCH LLC is one of the entities that currently owns and controls Larkin. LCH LLC is one of the Defendants collectively referred to as Larkin in this Complaint.

19.     Defendant Larkin Health Systems, Inc. (LHS) is a Florida corporation doing business in Miami, FL. The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that LHS also may be known as Fair Havens Holding Co. LW. Certain corporate records LHS as the general partner of some of the limited liability companies (LLCs) which currently operate the Retirement Home Defendants. LHS's last known business address is 3737 West Arthur Avenue, Lincolnwood, IL 60712. LHS is one of the entities which currently owns and controls Larkin. LHS is one of the Defendants collectively referred to as Larkin in this Compliant.

20.     Larkin Health Systems, LLC (L.HS LL.C) is a Florida limited liability corporation incorporated in April 2000 and is doing business in Florida LES LLC's last known business address is 201 Curtis Parkway, Miami, FL 33166, and its last known mailing address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712. Morris Esformes currently is the managing member of LHS LLC. LHS LLC is owned by LCH, Inc. (50%) and by Morris Esformes, Philip Esformes, Rachel Esformes, and Rebecca Esformes (50%). In or about November 2000, LHS LIE changed its name to Fair Havens Holding Company, LIE. LHS LLC is one of the entities which currently owns and controls Larkin. LHS LLC is one of the Defendants collectively referred to as Larkin in this Complaint.

## Oracle Health Systems

21.     Defendant Oracle Health Systems, Inc. (Oracle) is a Florida corporation doing business in Miami, FL. Oracle has been and is owned in whole by Jack Michel, who is its president. Oracle was and continues to be used to funnel payments to Jack Michel and other physicians in return for patient admissions to LCH.

## The Other Desnick-Controlled Entities

22.     Defendant Island Trust Company (Island) is an Illinois corporation doing business in Miami, FL. Island's last known business address is 980 North Michigan Avenue, Suite 1665, Chicago, IL 60611. Island w e the vehicle by which Defendant Desnick purchased Defendant LCH in 1997. Defendant Desnick owns and controls Island, and Desnick is the alter ego of Island. In or about July, 2003, Island entered into an agreement with the United States to waive the statute of limitations for the claims alleged in this action. This agreement has been extended and the current agreement requires that this Complaint be filed on or before June 30, 2004.

23.     Defendant Medical Management of America, Inc. (MMA) is a Delaware corporation which does business in Miami, FL. MMA's last known business address is 40 Skokie Boulevard, Suite 105, Northbrook, IL. MMA has been and is owned directly or indirectly by Defendant Desnick and/or trust funds setup for his or his family's benefit. Desnick owns and controls MMA and Desnick is the alter ego of MMA. In or about July, 2003, Desnick entered into agreements with the United States to waive the statute of limitations for the claims alleged in this action on behalf of his corporations, including MMA, HCMA and Island. These agreements have been extended and the current agreements require that this Complaint be filed on or before June 30, 2004.

24.     Defendant HCMA, Inc. a/k/a Health Care Management Associates, Inc. (HCMA), is an Illinois corporation which does business in Miami, FL. HCMA has been and is owned directly or indirectly by Defendant Desnick and/or trust funds set up for his or his family's benefit. Desnick owned or controlled HCMA and Desnick is the alter ego of HCMA. HCMA's last known business address is 40 Skokie Boulevard, Suite 105, Northbrook, IL.

## The Retirement Home Defendants[3]

25.     Defendant EMI Enterprises, Inc. (EMI) is an Illinois corporation which does

---

[3] All of the Defendants identified in paragraphs 25 to 56 are collectively referred to as the Retirement Home Defendants.

business in Miami, FL. The shareholders of EMI are Morris Esformes and Jack Michel. The last known address of EMI is 3737 West Arthur Avenue, Lincolnwood, IL 60712. On or about August 2000, EMI purchased an ownership interest in Fair Haven and maintains an ownership interest in Defendant A.D.M.E. Investment Partners, Inc. d/b/a Oceanside Extended Care and, at times relevant to the allegations herein, had an ownership interest in LCH.

26.    Defendant Morphil Corp. (Morphil) is a Florida corporation which does busine's in Miami, FL. Morphil owns the fictitious business name "inter-American Rest Home" (Inter-American), used to operate a 60-bed assisted living facility (ALF) located at 240 East 5th Street, Hialeah, FL 33010, and the fictitious business name "Family Health Home" (Family), used to operate an ALF located at 182 West 9th Street, Hialeah, El 33010. In 1997, the officers of Morphil were Moms Esformes and Philip Esformes. In 1998, Jack Michel replaced Morris Esformes as president of Morphil. In 2002, Philip Esformes replaced Jack Michel as president of Morphil. Morphil's last known business address is 240 East 5th Street, Hialeah, FL 33010.

27.    Defendant Morphil LLC (Morphil LLC) is a Florida limited liability corporation which does business in Miami, FL. The *managing* member of Morphil LLC is LHS. Morphil LLC's last known address is 3737 West Arthur Avenue, Lincolnwood, IL 60712. Morphil LLC is also involved in the operation of *Inter-American* and Family.

28.    Defendant Morr-Jack, Inc. (Morn-Jack) is a Florida corporation doing business in Miami, FL. The original shareholders of Mon-Jack were Morris Esformes and Jack Michel. Mon-Jack's last known business address is 999 Washington Avenue, Miami Beach, FL 33139. From 1997 until April 2002, Jack Michel was the president and Philip Esformes was a director of Mon-Jack. In April 2002, Philip Esformes replaced Jack Michel as president of Mon-Jack. Mon-Jack was involved with the *management* of the Retirement Home Defendants.   —^

29.    Defendant Morley, LC (Mersey) is a Florida limited liability corporation which is doing business in Miami, FL. Brickyard Bank, a bank located in Chicago in which Morris Esformes is a substantial depositor and investor, lent Mersey $2 million for the purchase of the real

property where Inter-American Rest Home and Family Health Home are located. Inter-American and Family are owned by Defendant Morphil Corp. In 1998, Morris Esformes and Seymour Abrams were the managing members of Mersey. In 2000, the managing member of Mersey was LHS, LLC. In 2001, the managing member of Morsey was ALF Holdings. Morse's last known address is 6865 North Lincoln Avenue, Lincolnwood, XL 60712.

30.     Defendant A.D.M.E. Investment Corp. (ADME Corp.) is a Florida corporation doing business in Miami, FL. ADME Corp. operates Oceanside Extended Care Center ("Oceanside"), a 196-bed facility. Oceanside is a skilled nursing facility (SNF) and/or and ALF, many of whose residents *were* unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. ADME Corp.'s last known business address is 550 9th Street, Miami, FL 33139 and its last known business mailing address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712. Jack Michel was the medical director of Oceanside beginning in at least 1996. From 1997 to December 31, 1999, Oceanside unnecessarily transferred patients to LCH, which is 20 miles *away*, bypassing a number of closer hospitals and endangering the health and well-being of the transferred patients. ADME Corp. and A.D.M.E. Investment Partners, Ltd, see q 31 below) are collectively referred to as Oceanside.

31.     Defendant A.D.M.E. Investment Partners, Ltd. (ADME Ltd.) is a Florida partnership which does business in Miami, Florida ADME Ltd. owns the fictitious business name 'Oceanside Extended Care Center" which it and ADME Corp. used to operate Oceanside. ADME Corp. is the general partner of ADME Ltd. ADME Ltd.'s last known business address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712. ADME Corp. and ADME Ltd. are collectively referred to as Oceanside.

32.     Defendant ALF Holdings, Inc. (ALF Holdings), is a Florida corporation doing business in Miami, FL. Until 2002, ALF Holdings was the General Partner of Money, LC and through Money LC, ALF Holdings owned the real property where Inter-American Rest Home and Family Rest Home are located in the Miami-Dade area. Inter-American and Family were two

ALFs many of whose residents were unnecessarily admitted to LCH by Jack Michel, George , Michel and other doctors paid kickbacks by Larkin. From 1997 until 2002, the officers and directors of ALF Holdings were Morris Esformes, Philip Esformes, and Jack Michel. In 2002, Jack Michel ceased to be a director of ALF Holdings. ALF Holdings' last known business address is Post Office Box 81433, Hollywood, FL 33081.

33.    Defendant Courtyard Manor Retirement Living, Inc. (Courtyard) is a Florida corporation doing business in Miami, FL. Courtyard operates a 86-bed ALF, known as "Courtyard Manor" located at 140 West 28'" Street, Hialeah, FL 33010. Courtyard Manor is a ALF many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. Courtyard's last known business mailing address is 11190 Biscayne Boulevard, Miami, FL 33181. From 1999 until 2002, Jack Michel was the president of Courtyard; in 2002, Philip Esformes replaced Jack Michel as president of Courtyard and was listed as the sole director of Courtyard.

34.    Defendant Courtyard Manor Retirement Investors, Ltd. (Courtyard Ltd.) is a Florida partnership doing business in Miami, FL. Courtyard Ltd. owns the fictitious business name "Courtyard Manor" under which Courtyard, Courtyard Ltd, and Courtyard Manor Retirement Living, LLC operate Courtyard Manor. The general partner of Courtyard Ltd. is Courtyard. In 1999, Courtyard Ltd. purchased the real property where Courtyard Manor is located. Courtyard Ltd.'s last known business address is 6865 North Lincoln Avenue, Lincolnwood, M 60712.

35.    Defendant Courtyard Manor Retirement Living, LLC (Courtyard LLC), is a Florida limited liability corporation doing business in Miami, FL. The managing member of Courtyard LLC is LHS. Courtyard LLC's last known business address is 3737 W. Arthur Avenue,

Lincolnwood, IL 60712.

36.     Defendant Fair Havens Holding Co., LLC (Fair Havens Holding) is a Florida limited liability corporation which does business in Miami, FL. Fair Havens Holdings, together with Fair Havens LLC, operates a 269-bed skilled nursing facility in Miami, Springs, FL. Fair Havens Holding's last known mailing address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712. The managing member of Fair Havens Holding is Morris Esformes. Fair Havens LCC was formerly known as LHS LLC.

37.     Defendant Jene's Retirement Living, Inc. (Jene's) is a Florida corporation doing business in Miami, FL, Jene's operates an ALF located at 1595 NE 145th Street, North Miami, FL 33161. Jene's is an ALP many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. aerie's last known mailing address is 11190 Biscayne Boulevard, Miami, FL 33181.

38.     Defendant Jene's Retirement Investors, Ltd. (Jene's Ltd.) is a Florida partnership doing business in Miami, FL. The general partner of Jene's Ltd. is Jene's. Jene's Ltd's last known business address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712.

39.     Defendant Jene's Retirement Living, LLC (Jene's LLC) is a Florida limited liability corporation which does business in Miami, FL. The managing member of Jene's LLC is LHS. The last known business address of Jene's LLC is 3737 West Arthur Avenue, Lincolnwood, IL 60712.

40.     Defendant La Covadonga Retirement Living, Inc. (La Covadonga) is a Florida corporation doing business in Miami, FL. La Covadonga operates a 34-bed ALF located at 820 SW 20th Street, Miami, FL 33135. La Covadonga is an ALF many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. La Covadonga's last known business mailing address is 11190 Biscayne Boulevard, Miami, FL 33181. From 1999-2001, Jack Michel was the president and Philip Esformes was the vice president of La Covadonga. In 2002, Philip Esformes became the president of La Covadonga.

41.    Defendant La Covadonga Retirement Investors, Ltd. (La Covadonga Ltd.) is a Florida partnership doing business in Miami, FL. La Covadonga Ltd. owns the fictitious business name "La Covadonga" under which it, La Covadonga, and La Covadonga Retirement Living LLC operate "La Covadonga" ALF. La Covadonga Ltd.'s last known business address is 6865 North Lincoln Avenue, Lincolnwood, IL 60712. The general partner of La Covadonga Ltd. is La Covadonga. In or about 1998, La Covadonga Ltd. purchased the real property where La Covadonga ALF is located.

42.    La Covadonga Retirement Living LLC (La Covadonga LLC) is a Florida limited liability corporation which does business in Miami, FL. The managing member of La Covadonga LLC is LHS. The last known business address of La Covadonga LLC is 3737 West Arthur Avenue, Lincolnwood, IL 60712.

43.    Defendant The Pointe Retirement Living, Inc. (The Pointe) is a Florida corporation doing business in Miami, FL, The Pointe operates a 72-bed ALF located at 3051 East 4ª Street, Hialeah, FL 33010. The Pointe is an ALF many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. From 1999 until 2002, Jack Michel was the president of The Pointe; in 2002, Philip Esformes replaced Jack Michel as President of The Pointe. The Pointe's last known business mailing address is 11190 Biscayne Boulevard, Miami, FL 33181.

44.    Defendant The Pointe Retirement Investors, Ltd. (The Pointe Ltd.) is a Florida partnership doing business in Miami, FL. The Pointe Ltd. is the owner of the fictitious business name "The Pointe of Hialeah" under which it, The Pointe, and The Pointe Retirement Living, LLC operate a nursing home. The general partner of The Pointe Ltd. is The Pointe. In or about 1998, The Pointe Ltd. purchased the real property on which "The Pointe of Hialeah" is located. This purchase was funded by a loan from Maven Retirement Investors, Ltd. and State Parkway Associates, Ltd., both entities which were owned and/or controlled by Morris Esformes. The Pointe Ltd.'s last known business address is 6865 North Lincoln Avenue, Lincolnwood, IL 60711

44.    Defendant The Pointe Retirement Living, LLC (The Pointe LLC) is a Florida limited liability corporation doing business in Miami, FL. The managing member of The Pointe LLC is LHS. The last known business address of The Pointe LLC is 3737 West Arthur Avenue, Lincolnwood, IL 60712.

45.    Defendant Rainbow Retirement Living, Inc. (Rainbow) is a Florida corporation doing business in Miami, FL. Rainbow operates a 48-bed ALF (Rainbow Retirement) located at 75 East 7th Street, Hialeah, FL 33010. Rainbow is an ALF many of whose residents were unnecessarily admitted to *LCH* by lack Michel, George Michel and other doctors paid kickbacks by Larkin. Rainbow's last known business mailing address is 11190 Biscayne Boulevard, North Miami, FL 33181.

46.    Defendant Rainbow Retirement Investors, Ltd. (Rainbow Ltd.) is a Florida partnership doing business in Miami, FL. The general partner of Rainbow Ltd. is Rainbow. In or about 1999, Rainbow Ltd. purchased the real property where Rainbow Retirement is located. Rainbow Ltd. 's last known business address is 6865 North Lincoln Avenue, Lincolnwood, IL

48.    Defendant Rainbow Retirement Living, LLC (Rainbow LLC) is a Florida limited liability corporation doing business in Miami, FL. The managing member of Rainbow LLC is IRS.

49.    Defendant Williamsburg Retirement Living, Inc. (Williamsburg) is a *Florida* corporation doing business in Miami, FL. Williamsburg operates a 147-bed ALF (Williamsburg Retirement) located at 11190 Biscayne Boulevard, North Miami, FL 33181. Williamsburg is an ALF many of whose residents were unnecessarily admitted to LCH by lack Michel, George Michel and other doctors paid kickbacks by Larkin. The administrator of Williamsburg is Defendant Pace. From 1998 until 2002, lack Michel was the president of Williamsburg; in 2002, Philip Esformes replaced Jack Michel as the president of Williamsburg. Williamsburg's last known business address is 11190 Biscayne Boulevard, North Miami, FL 33181.

50.     Defendant Williamsburg Retirement Investors, Ltd. (Williamsburg Ltd.) is a Florida partnership doing business in Miami, FL. The general partner of Williamsburg Ltd. is Williamsburg. Williamsburg Ltd's last known address is 3737 West Arthur Avenue, Lincolnwood, 1Z 00712. In or about 1998, Williamsburg purchased the real property where Williamsburg Retirement Living is located. The loan for part of the purchase of this real property was provided by State Parkway Associates, Ltd.

51.     Defendant Williamsburg Retirement Living LLC (Williamsburg LLC) is a Florida LLC doing business in Miami, FL. The managing member of Williamsburg LLC is LHS. Williamsburg LLC's last known address is 3737 West Arthur Avenue, Lincolnwood, IL 60712.

52.     Defendant Maven Retirement Living, Inc. (Maven Inc.) is a Florida corporation which is doing business in Miami, FL. Maven Inc. is the general partner of Maven Ltd. and State Parkway Associates, Inc., which are the source of the funds used to purchase The Pointe retirement home. The Pointe is an ALF many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin. The officers of Maven Inc. are Moths Esformes and Philip Esformes. Maven Inc.'s last known business address is 999 Washington Avenue, Miami Beach, FL 33139.

53.     Defendant Maven Retirement Investors, Ltd. (Maven Ltd.) is a Florida limited partnership doing business in Miami, FL. Maven Ltd. is a legal entity created and controlled by Morris Esformes to provide funding for the purchase of real property on which The Pointe is located. The general partner of Maven Ltd. is Maven, Inc. of which Morris Esformes and Philip Esformes are officers and directors. Maven Ltd.'s last known address is 999 Washington Avenue, Miami Beach, FL 33139.

54.     Defendant State Parkway Associates, Ltd. (State Parkway) is a Florida limited partnership which is doing business in Miami, FL. State Parkway is the lender of $250,000 to The Point Retirement Investors, Ltd. for the purchase of the real property where The Pointe retirement home is located. The general partner of State Parkway is Maven Inc., of which Morris Esformes is

the president and Philip Esformes is the vice president. State Parkway's last known address is 999 Washington Avenue, Miami, FL 33139.

55.   Ridgeway Associates, Ltd. (Ridgeway) is a Florida limited partnership which is doing business in Miami, FL. The general partner of Ridgeway is Maven Inc. Ridgeway's last known address is 999 Washington Avenue, Miami, FL 33139.

56.   Defendant A.C.L.F. Management Group, Inc. (ACLF Mgmt.) is a Florida corporation which is or was doing business in Miami, FL. ACLF Mgmt. does business under the fictitious business name Royal Living Retirement Home. ACLF Mgmt.'s last known business address is 2926-28 SW 2nd Street, Miami, FL 33125. The officers of ACLF Mgmt. are Jose Cardoso and Jack Michel. Royal Living is an ALF many of whose residents were unnecessarily admitted to LCH by Jack Michel, George Michel and other doctors paid kickbacks by Larkin.

### Alter Ego Relationships

57.   As set forth in more detail in Appendix A hereto, Defendants Jack Michel, Moths Esformes and Philip Esformes are liable in this action for the conduct of their various corporations, partnership and LLCs which were acting as their alter egos. Jack Michel, Morris Esformes, and/or Philip Esformes created separate legal entities, generally S corporations, limited partnerships, limited liability corporations (LLCs), and fictitious business names, for each Retirement Home Defendant that Jack Michel, Moths Esformes, and/or Philip Esformes owned or controlled. The separate legal entities have changed name, form and structure at various times during the period relevant to this action. The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that the purpose of this complex corporate organization of the Retirement Home Defendants was to insulate Jack Michel, Morris Esformes, and/or Philip Esformes from any scrutiny of their business decisions and practices. $ Appendix A to this Complaint demonstrating the overlap of the Retirement Home Defendants.

58.   As set forth in more detail in Appendix A hereto, Defendants Jack Michel, Morris

Esformes, and/or Philip Esformes created separate legal entities (a) through which they owned or operated SNFs, ALFs, and/or assisted care living facilities (ACLFs) and other *health* can providers, while dominating and controlling them all, operating them in an integrated manner, and disregarding the subsidiary corporations' basic corporate form; (b) that shared common ownership, board membership and management; (c) that shared corporate, group and divisional resources to perform operational, administrative, financial and reimbursement functions; and (d) that precluded the legal entities from conducting business except that which was directed by and in the interests of the ultimate owners, Jack Michel and/or Morris Esformes and/or Philip Esformes. As set forth in more detail in Appendix A hereto, Jack Michel, Morris Esformes, and Philip Esformes operated various subsidiaries and affiliates as mere shell corporations through which corporate directives flowed to ALFs, ACLFs, and SNFs operated by the Retirement Home Defendants, and profits and other revenue flowed from the ALFs, ACLFs, and SNFs operated by the Retirement Home Defendants to Jack Michel, Morris Esformes, Philip Esformes, and other corporate entities they owned and controlled.

59.    Defendant Desnick created separate legal entities, including but not limited to Defendants LCH (from March 1997 until March 1998), MMA, Island and HCMA, and each of their subsidiaries, (a) through which he owned or operated Larkin and allegedly provided medical management services to Larkin by way of MMA and HCMA, while he dominated and controlled them all, operated them in an integrated manner, and disregarding the subsidiary corporations' basic corporate form; (b) that shared common ownership, board membership and management; (c) that shared corporate, group and divisional resources to perform operational, administrative, financial and reimbursement functions; and (d) that precluded the legal entities from conducting business except that which was directed by and in the interests of the ultimate owner, Desnick. Desnick operated various entities, including but not limited to LCH, MMA, Island, and HCMA, as mere shall corporations *through which* corporate directives flowed to LCH, MMA, Island, and HCMA, and profits and other revenue flowed from hospital operations to Desnick, his family and

corporate entities that he owned or controlled.

## BACKGROUND

## THE LAW

A.   The False Claims Act

60.   The FCA provides, in pertinent part that

(a)   Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; .. or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

. . .

is liable to the United States Government ... .

(b)   For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

B.   The Anti-Kickback Statute

61. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments

of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

62.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

(b) Illegal remuneration

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing *of* any item or service for *which* payment may be made in whole or in part under a Federal *health* care program, or

(B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction the*reof,* shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b), Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-la(a)(7).

C.   The Stark Statute

63.    Section 1877 of the Social Security Act, codified at 42 U.S.C. § 1395nn and commonly referred to as the "Stark Statute," prohibits a physician from referring Medicare patients for certain "designated health services" (DHS) to an entity with which he has a "financial relationship" unless an exception applies. When originally enacted in 1989 ("Stark I"), the prohibitions applied only to physicians' referrals for clinical laboratories. Omnibus Budget

Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the Stark Statute to referrals for ten additional DHS, including inpatient and outpatient hospital services (Stark U). *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

64.    In addition to prohibiting certain physician referrals, the Stark Statute prohibits health care entities from presenting or causing to be presented any Medicate claim for DHS provided as a result of a prohibited referral, 42 U.S.C. § 1395(a)(1)(B). Any entity that collects Medicare payment for DHS rendered pursuant to a prohibited referral must refund all collected amounts. 52 U.S.C. § 1395nn(g)(2); 42 C.R. § 411.353(d).

65.    Under the Stark Statute, the United States will not pay for certain items or services prescribed or ordered by physicians who have improper financial relationships with the entities that furnish those items or services. One of the major purposes of the statute was to reduce losses suffered by the Medicare program due to overutilization of services.

66.    The Stark Statute broadly defines "financial relationship" to include ownership and investment interest and compensation agreements that involve any direct or indirect remuneration between a physician and an entity providing DHS. The statute's exceptions identify specific types of investments and compensation agreements that will not violate its referral and billing prohibitions.

67.    For example, compensation paid to a referring physician serving as a consultant to a hospital will fall within an exception to the statute if the contract (1) is in writing and signed by the parties; (2) is for a term of at least *a year*; (3) specifies the services covered, covers all the services to be provided by the physician, and the aggregate of such services is reasonable and necessary for the legitimate business purposes of the hospital; and (4) sets the payment for contract services in advance, consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties, 42 U.S.C. §

1395nn(e)(3). Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that exceeds fair market value, for which no actual services are performed, or which takes into account the volume or value of the referrals or other business generated between the panics, triggers the referral and payment prohibitions of Stark U with respect to designated health services referred by that physician.

**68.** Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

## THE FEDERAL HEALTHCARE PROGRAMS

A.    The Medicare Program

69.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A,

70.    HHS is responsible for the administration end supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Agency (HCFA), is an agency of HISS and is directly responsible for the administration of the Medicare program.

71.    Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Medicare Part B covers physician services as well as a variety of "medical and other health services," including durable medical equipment and supplies. The allegations herein relate to Part A services provided by LCH. In addition to other limitations on coverage, Medicare covers only those

MIAMI HCF SQUAD C4
305 787 6685

h event with an intent fraudulently to secure such benefit or payment

greater amount or quantity than is due or when no such benefit or

authorized... shall in the case of such a . . .

t or failure ... be guilty of a felony.

kin submitted cost reports at all times material to this Complaint.

e **Medicaid Program**

e XIX of the Social Security Act, 42 U.S.C. §§ 1396, et gg., establishes the

. Medicaid is a joint federal-state program that provides health care benefits for

marily the poor and disabled. The United States provides a significant share of

he Medicaid program and also ensures that the states comply with minimum

ministration of the program.

ch state must have a single State agency to administer the Medicaid program. 42

)(5). The Florida Medicaid program is administered by the Agency *for* Health

ion (ACHA). In paying hospital claims under Medicaid, Florida relies on Form

dified version of the Medicare cost report forms (Medicaid Cost Reports).

om 1997 until December 31, 1999, the percentage of funds from the Federal

he Florida Medicaid Program varied between 50.72% and 58.83%.

he Medicaid Program paid Larkin over $9.79 million from 1997 until December

onse to claims submitted to Medicaid by Larkin. Approximately 50 percent of that

aid by Medicaid, or $4.89 million, was federal funds.

## THE SCHEMES

E 1997 SCHEME: KICKBACKS AND MEDICALLY UNNECESSARY

RVICES

**Ownership of Larkin By Desnick and His Related Corporations**

From March 1, 1997 until at least December 31, 1997, Desnick directly or indirectly

MA, and HCMA in his alter ego corporations) owned and controlled LCH. During this time,

administrator of the provider or a responsible designee of the administrator.

83. At all times relevant to this Complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report *may* be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a halfback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result,

84. At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report) is a tn1e, correct and complete statement prepared from the books and *records* of the provider in accordance with applicable instructions, except as noted.

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

85. Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were not infected by kickbacks and were billed in compliance with the Stark Statute.

86. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever ... having knowledge of the *occurrence* of any event affecting (A) his initial or continued right to any such benefit or payment ... conceals or fails to

305-787-6685   p.31

...ently to secure such benefit or payment
...han is due or when no such benefit or
... such a . . .

...ony.

... times material to this Complaint.

... Act, 42 U.S.C. §§ 1396, et gg., establishes the
...tate program that provides health care benefits for
... The United States provides a significant share of
...so ensures that the states comply with minimum

...tate agency to administer the Medicaid program. 42
...rogram is administered by the Agency *for* Health
...tal claims under Medicaid, Florida relies on Form
... cost report forms (Medicaid Cost Reports).

..., 1999, the percentage of funds from the Federal
... varied between 50.72% and 58.83%.
...arkin over $9.79 million from 1997 until December

...Medicaid by Larkin. Approximately 50 percent of that
...lion, was federal funds.

...THE SCHEMES
...KBACKS AND MEDICALLY UNNECESSARY

...esnick and His Related Corporations

...t least December 31, 1997, Desnick directly or indirectly
...o corporations), owned and controlled LCH. During this time,

LCH sought patient referrals from doctors, paying kickbacks in return for these referrals. LCH, at the direction of Desnick and his alter ego corporations, admitted patients and billed Medicare and Medicaid for their beneficiaries' treatment with the knowledge that kickbacks had been paid to physicians for their referrals, that there were financial relationships which violated the Stark Statute, and that many of the services provided in connection with these admissions were medically unnecessary.

### 2.   Physician Recruitment by Desnick and His Agents

93.   In 1997, Larkin paid HCMA at least $750,000 in fees. HCMA employed Robert Krasnow (Krasnow), Desnick's long-time business associate and employee and/or agent, who at the direction of Desnick, set up and enforced kickback arrangements with the referring doctors during the March to December 1997 period.

94.   At Desnick's direction, Krasnow, with the assistance of other employees of Larkin, (1) negotiated agreements with physicians for payments to them in return for their admission of patients to Larkin, and (2) regularly reported to Desnick as to the number of Larkin admissions by such paid physicians, the details of the kickback agreements with physicians, and the Larkin patient census, Krasnow acted as Desnick's agent and/or employee in recruiting *these* physicians, including but not limited to Jack Michel.

### 3.   Dr. Jack Michel, Dr. George Michel, and Oracle Health Systems

95.   In or about March 1997, Jack Michel met with Krasnow and said, "ask your boss if he would pay $1 million to make $5 million." Krasnow conveyed this proposition to Desnick, who thereafter met with Jack Michel in Miami. Thereafter, Desnick, Jack Michel, LCH, Oracle, George Michel, Island, MMA, HCMA, Palacios, and Oceanside entered into a scheme to engage in the following seven types of kickback arrangements between Larkin and Jack Michel and/or Oracle.

96.   Illegal Patient Referrals b Jack Michel George Michel and Oracle: Beginning in or about March 1997, Larkin paid Jack Michel and/or Oracle approximately $70,000 per month in

305 787 6681

.ent fraudulently to secure such benefit or payment
quantity than is due or when no such benefit or
the case of such a . . .

lty of a felony.

:ports at all times material to this Complaint.

m

al Security Act, 42 U.S.C. §§ 1396, et gg., establishes the
It federal-state program that provides health care benefits for
d disabled. The United States provides a significant share of
am and also ensures that the states comply with minimum
program.
a single State agency to administer the Medicaid program. 42

Medicaid program is administered by the Agency for Health
aying hospital claims under Medicaid, Florida relies on Form
e Medicare cost report forms (Medicaid Cost Reports).

December 31, 1999, the percentage of funds from the Federal
d Program varied between 50.72% and 58.83%.

am paid Larkin over $9.79 million from 1997 until December
itted to Medicaid by Larkin. Approximately 50 percent of that
4.89 million, was federal funds.

## THE SCHEMES

### KICKBACKS AND MEDICALLY UNNECESSARY

#### By Desnick and His Related Corporations

ntil at least December 31, 1997, Desnick directly or indirectly
r ego corporations) owned and controlled LCH. During this time,

kickbacks in return for patient referrals to Larkin by Jack Michel, George Michel, and other physicians affiliated Oracle. Many, although not all, of these kickbacks were in the form of above fair market value payments for services allegedly rendered to Larkin by Oracle. There was no signed, written contract between Larkin or LCH and Jack Michel and/or Oracle for these services. Desnick, LCH, Island, MMA, HCMA and employees and/or agents of Desnick were aware that these admissions were contingent on these kickbacks to Jack Michel and/or Oracle.

97.     Many of the patients admitted to Larkin in 1997 by Jack Michel and George Michel were residents of Oceanside, a skilled nursing facility located in North Miami Beach. At times relevant to the allegations herein, Jack Michel was the medical director at Oceanside. Oceanside residents were transported to Larkin where there were provided with medically unnecessary services with the knowledge of Oceanside's ownership, Morris Esformes and Philip Esformes.

98.     Improper Payments for Staffing The Larkin Emergency Room: In 1997, Jack Michel and Oracle were put in charge of the Larkin emergency room (ER). LCH paid Jack Michel and Oracle approximately $46,000 per month to operate the Larkin ER. In reality, these payments were additional kickbacks for Jack Michel and George Michel's referrals to Larkin. Until approximately late September 1997, Jack Michel staffed the Larkin ER with physician's assistants. LCH paid Jack Michel and Oracle approximately 518,000 more per month than the prior emergency medicine group which staffed the Larkin ER with licensed medical doctors. There was no signed, written contract between Jack Michel and/or Oracle and Larkin and /or WIT for the provision of ER services.

99.     Improper Payments for Staffing The Larkin Radiology Department: In 1997, Jack Michel and Oracle were put in charge of the Larkin radiology department. Jack Michel and Oracle were paid about $24,000 per month purportedly to operate the Larkin radiology department. In reality, these payments were additional kickbacks for Jack Michel and George Michel's referrals of patients to Larkin. Prior to hiring Jack Michel and Oracle, the Larkin Radiology department had been a fee-for-service department, which resulted in no out-of-pocket expenses for LCH. There

eturn for patient referrals to Larkin by Jack Michel, George Michel, and other

iated Oracle. Many, although not all, of these kickbacks were in the form of above

ue payments for services allegedly rendered to Larkin by Oracle. There was no

contract between Larkin or LCH and Jack Michel and/or Oracle for these services.

Island, MMA, HCMA and employees and/or agents of Desnick were aware that

is were contingent on these kickbacks to Jack Michel and/or Oracle.

Many of the patients admitted to Larkin in 1997 by Jack Michel and George Michel

of Oceanside, a skilled nursing facility located in North Miami Beach. At times

allegations herein, Jack Michel was the medical director at Oceanside. Oceanside

transported to Larkin where there were provided with medically unnecessary

he knowledge of Oceanside's ownership, Morris Esformes and Philip Esformes.

Improper Payments for Staffing The Larkin Emergency Room: In 1997, Jack

Oracle were put in charge of the Larkin emergency room (ER). LCH paid Jack

racle approximately $46,000 per month to operate the Larkin ER. In reality, these

additional kickbacks for Jack Michel and George Michel's referrals to Larkin. Until

y late September 1997, Jack Michel staffed the Larkin ER with physician's assistants.

ack Michel and Oracle approximately 518,000 more per month than the prior

edicine group which staffed the Larkin ER with licensed medical doctors. There was

ritten contract between Jack Michel and/or Oracle and Larkin and /or WIT for the

ER services.

Improper Payments for Staffing The Larkin Radiology Department: In 1997, Jack

Oracle were put in charge of the Larkin radiology department. Jack Michel and Oracle

bout $24,000 per month purportedly to operate the Larkin radiology department. In

payments were additional kickbacks for Jack Michel and George Michel's referrals of

arkin. Prior to hiring Jack Michel and Oracle, the Larkin Radiology department had

for-service department which resulted in no out-of-pocket expenses for LCH. There

was no signed, written contract between Jack Michel and/or Oracle and Larkin and/or LCH for the provision of radiology services,

100.   **Improper Payments for Staffing The Larkin House Call Program**:  In 1997, Jack Michel and/or Oracle were put in charge of the Larkin "House Call" program, which provided doctors who visited patients at their residences. Jack Michel and/or Oracle billed Larkin $8,000 plus expenses per month in connection with the House Call Program. There was no signed, written contract between Jack Michel and/or Oracle and Larkin and/or LCH for the provision of "House Call" services and, in reality, such payment constituted additional kickbacks to Jack Michel.

101. **Improper Payment of the Salaries of Oracle Employees**: In 1997, LCH paid over $60,000 in the salaries for Palacios and seven other employees of Jack Michel and/or Oracle as if they were LCH employees. These payments were further, indirect kickbacks to Jack Michel.

102. **Improper Payments to Jack Michel's Pharmacy**: In 1997, LCH paid checks totaling at least $14,000 to Le Jeune Pharmacy, which was owned by Jack Michel, These payments were additional indirect kickbacks to Jack Michel.

103.   **Improper Payments to Palacios' Corporations**: Palacios participated in the 1997 Scheme to pay kickbacks to Jack Michel and to churn Oracle patients through LCH. When the patient census at LCH was low, Palacios contacted employees of various ALFs and SNFs, including those where Jack Michel or George Michel were medical director, to solicit admissions to the Hospital Palacios controlled corporations nominally owned by his wife, including but not limited to Advocare Health Services, Inc. (Advocate) and Lipton and Associates, Inc. (Upton) (collectively Palacios' corporations). In 1997 Larkin paid at least $82,000 to Advocare, which in 1996 had been operated by Jack Michel's in-laws. Likewise, in 1997 LCH paid at least $33,000 to Lipton. The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that these payments were indirect kickbacks to Jack Michel.

104.   At times, Jack Michel and Desnick represented to others that the purpose of the

ts to Jack Michel and/or Oracle was that Desnick intended to purchase Oracle. There was

ed, written contract for the purchase of Oracle by Larkin, and the proposed sale never was

mated, The United States anticipates that a reasonable opportunity for further investigation

covery will establish that this proposed transaction was a sham designed to disguise

k payments to Jack Michel and Larkin.

105.   On or about June 19, 1997, Jack Michel "purchased" a ten percent interest in LCH.

urchase" was funded with a promissory now for $770,000, and lack Michel paid

00 in cash as a down payment The source of Jack Michel's down payment was a

sory note from Brickyard Bank, located in suburban Chicago, IL. (Both Defendants Desnick

rris and Philip Esformes have long term relationships with Brickyard Bank.) The United

anticipates that a reasonable opportunity for further investigation and discovery will

sh that this purchase was a sham transaction because Jack Michel made no payments on

missory note for the purchase and/or the promissory note for the down payment until at least

pril 1998 when he purchased the entire Hospital.

106.   On or about November 18, 1997, Jack Michel "purchased" an additional 10 per cent

t in LCH. This "purchase" likewise was funded by a promissory note for $770,000, and lack

l paid $330,000 in cash as a down payment. The source of Jack Michel's cash down payment

promissory note, also from Brickyard Bank, guaranteed by Desnick for $330,000. Thus,

ck was both the guarantor and the seller on the transaction, and neither Desnick nor Jack

l had any risk if Jack Michel defaulted on the note. The United States anticipates that a

able opportunity for further investigation and discovery will establish that this purchase was

n transaction because Jack Michel made no payments on the promissory note for the purchase

and/or the promissory note for the down payment until at least after April 1998 when he purchased the entire Hospital.

**4.    Salaries for Medical Directors At Larkin**

107.    Beginning in or about March 1997, LCH paid a variety of physicians, other than Jack Michel, kickbacks in the form of salaries for medical directors, in return for patient referrals to Larkin. Desnick was aware of these improper payments, and these physicians were issued checks by LCH that were signed at Desnick's direction. A chart was prepared by or for Desnick that compared the monthly payments to these doctors with their charges and bears Desnick's handwritten notes. ¿ Exhibit A to this Complaint While some of these physicians had written contracts with Larkin, these were sham contracts because the doctors performed virtually no services for Larkin, the payments often pre-dated the written contract by months, and the doctors were paid above market rates for the minimal services that they provided.

108.    In 1997, Larkin's medical directors other than Jack Michel (Larkin Medical Directors) referred patients who constituted 25%, or $2,278,763, of the Medicare payments to LCH.

109.    Many of the claims resulting from these admissions were false because the admission not medically necessary, resulted in multiple medical consultations and medical services that were not medically necessary, and resulted in extended hospital stays that were not medically necessary.

**B. 1998 — 1999 SCHEME: MEDICALLY UNNECESSARY SERVICES**

110.    In or about December 31, 1997, Jack Michel purchased LCH from Desnick, MMA and Island. (In actuality, this sale did not close until April 1998, and Desnick continued to have substantial involvement and control over Larkin until approximately September 1998.)

111.    When Jack Michel purchased LCH, George Michel was the admitting physician

for virtually all of the nursing home referrals. In 1998 alone, George Michel caused Medicare to pay to Larkin $4,806,667.64, or 38% of the entire 1998 Medicare payment to Larkin. In 1999, George Michel caused Medicare to pay Larkin $2,235,742.27, or 20% of the entire 1999 Medicare payment to Larkin. Prior to Jack Michel's purchase of LCH, he and Philip Esformes met and concluded that when Jack Michel purchased Larkin, Jack Michel could eliminate the 1997 Scheme of paying kickbacks to doctors for improper admissions. Instead, they decided to keep Larkin's patient census high by having Larkin provide medically unnecessary services to the patients served by Oracle and the residents of the numerous ALFs, SNFs and other retirement facilities with which Jack Michel and/or George Michel were already associated, as well as facilities Jack Michel, Morris Esformes, and Philip Esformes owned or planned to buy. Beginning in 1997, Jack Michel, Philip Esformes and/or Morris Esformes purchased, and operated several nursing homes, ALFs, and ACFs. From August 1997 to March 1999, they purchased 7 ALFs. Additionally since *December 1996, they* owned Oceanside, a SNF.

112.    Jack Michel, LCH, Philip Esformes, Morris Esformes, George Michel, Pace, Palacios, Oracle, and the Retirement Home Defendants participated in The 1998 — 1999 Scheme. Larkin representatives, including but not limited to Jack Michel and Palacios, called the administrators *employed* by the Retirement Home Defendants and requested that they send patients to the Hospital because the census was low. Defendant Pace participated in this scheme by knowingly arranging to have patients from Williamsburg transferred to LCH for medically unnecessary services.

113.    Many of the patients admitted to Larkin as a part of this scheme did not have conditions that warranted admission to Larkin, were unnecessarily admitted for conditions that were not supported by their symptoms, and were provided with medical services, medical consultations and extended hospital stays that were not medically necessary. On several occasions, the Retirement Home Defendants bypassed closer and more conveniently located hospitals in order to transport and refer patients to LCH.

114.    A survey conducted by the ACHA of patients admitted to Larkin in 1998 and 1999 demonstrated that a minimum of 50 percent of the services rendered to the patients in that study were medically unnecessary.[4]   The United States anticipates that a reasonable opportunity for further investigation and discovery will establish that similarly: (1) at least 50 percent of the admissions made to Larkin by Jack Michel and George Michel in 1997 were for medically unnecessary services and (2) at least 50 percent of the admissions to Larkin by George Michel from 1998 — 1999 were for medically unnecessary services.

## C. FALSE FORM UB-92s AND FALSE COST REPORTS

115.    In addition to filing interim payment requests for Medicare and Medicaid reimbursement on Form UB-92s, Larkin was required to submit annual cost reports to the Medicare and Medicaid program through the fiscal intermediary. The Cost Reports filed by LCH covering services rendered from at least March 1, 1997 to December 31, 1999 contained false or fraudulent claims for payment because they sought reimbursement for services provided in connection with the 1997 Scheme and the 1998 -1999 Scheme,

116.    The Larkin Cost Reports here at issue include the 1997 Cost Report (filed 5/26/98), the 1998 Cost Report and the 1998 Amended Cost Report (filed 10/17/00) and the 1999 Cost Report (filed 6/20/00), as well as the versions of those Cost Reports submitted to Medicaid. All of these Cost Reports, which included the certifications quoted in ¶182 — 82, that no kickbacks had been paid and that the cost reports were true and correct, were signed by Jack Michel. Moreover, in none of these cost reports did Larkin disclose any known error and omission in its claims for Medicare and Medicaid reimbursement, specifically, the payment of kickbacks and the medically unnecessary treatments.

---

[4] he patient claims information for the Larkin patients who were the subject of this ACHA survey will be compiled in a separate document which will be served on the Defendants and, if the Court so orders, will be filed under seal with the Court. This detailed claims information included patient names, social security numbers, dates of services, diagnosis codes, and treating physicians.

305 787 6685    P.40

117.    Defendants LCH, Jack Michel, MMA, HCMA, Island, George Michel, Palacios, Oracle, and Oceanside submitted or caused to be submitted the false UB-92s and 1997 Larkin Cost Report; these same Defendants had actual knowledge, recklessly disregarded or were deliberately ignorant that the UB-92s and Cost Report were false because they were part of the 1997 Scheme. In addition to soliciting and receiving kickbacks, Jack Michel had heard that in 1997 Desnick and Larkin employees were paying kickbacks to the other Larkin Medical Directors, but Jack Michel made no effort to determine whether this was true and to correct the 1997 Cost Report accordingly.

118.    Although Desnick no longer owned Larkin *when* the false 1997 Cost Report was filed, he caused this Cost Report to be filed. At his direction, his employees, including but not limited to Philip Robinson, provided information and instructions to the accountants whom Desnick, MMA, Island, HCMA, and Larkin retained to prepare this Cost Report. In connection with the 1997 Cost Report, Desnick also approved the decision to re-characterize the payments made to him and his employees, which were originally identified as "management fees," as "distributions to shareholders" in this Cost Report. Additionally, at Desnick, MMA, Island, and HCMA's instruction, the improper payments to Jack Michel, Oracle, the Palacios corporations, and other Larkin Medical Directors who were paid kickbacks by Larkin, were removed from the 1997 Cost Report. The 1997 Cost Report remained false in that it included the costs arising from the admissions to Larkin made by Jack Michel, George Michel, and the Larkin Medical Directors in return for kickbacks.

119.    For fiscal years 1998 and 1999, Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, George Michel, Morris Esformes, Philip Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants submitted or caused to be submitted the false UB-92s and the 1998 and 1999 Larkin Cost Reports. These same Defendants had actual knowledge, recklessly disregarded or were deliberately ignorant that the services for which reimbursement was sought by Medicare and Medicaid in these UB-92s and Cost Reports were based upon kickbacks and/or

were not medically necessary, as described above in l 6- 8, 110 — 114.

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
## AGAINST ALL DEFENDANTS

120.    Plaintiff re-alleges and incorporates herein by reference paragraphs I through 119.

121.    All Defendants identified more specifically below, knowingly presented or caused to be presented false or fraudulent claims[5] to the United States for payment by the Medicare and Medicaid programs, in violation of the FCA, 31 U.S.C. § 3729 (a)(1).

122.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial

**A.    False Claims Made as Part of The 1997 Scheme**

**1.    The 1997 Scheme to Pay Kickbacks to Jack Michel and/or Oracle and/or for Medically Unnecessary Services As A Result of Jack Michel's and George Michel's Referrals to Larkin**

123.    As described more specifically above in ¶ 2 — 5, 92 — 106, the 1997 UB-92s and the 1997 Larkin Cost Report[6] were false or fraudulent because they included claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, because Jack Michel and Oracle had entered into prohibited financial relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary, Defendants Jack Michel, LCH, George Michel, Palacios, Island, MMA, HCMA, Oceanside and Oracle knowingly presented or caused to be presented false or

---

[5] e details of all of the Medicare and Medicaid claims *relevant* to the allegations in this Compliant have been compiled in a separate document which will be served on the Defendants and, if the Court so orders, will be *Bled* under seal with the Corot This detailed claims information includes patient names, social security numbers, dates of services, diagnosis codes, and treating physicians.
[6] ost Reports as used in the Counts in this Complaint, includes both the Medicare Cost Reports and the Medicaid Cost Reports.

MIAMI HCF `1aJAD C4

305 784 6685      P.36

mes, Jack Michel and Desnick represented to others that the purpose of the

Michel and/or Oracle was that Desnick intended to purchase Oracle. There was

contract for the purchase of Oracle by Larkin, and the proposed sale never was

e United States anticipates that a reasonable opportunity for further investigation

ill establish that this proposed transaction was a sham designed to disguise

ts to Jack Michel and Larkin.

n or about June 19, 1997, Jack Michel "purchased" a ten percent interest in LCH.

was funded with a promissory now for $770,000, and lack Michel paid

sh as a down payment The source of Jack Michel's down payment was a

e from Brickyard Bank, located in suburban Chicago, IL. (Both Defendants Desnick

Philip Esformes have long term relationships with Brickyard Bank.) The United

tes that a reasonable opportunity for further investigation and discovery will

his purchase was a sham transaction because Jack Michel made no payments on

note for the purchase and/or the promissory note for the down payment until at least

8 when he purchased the entire Hospital.

On or about November 18, 1997, Jack Michel "purchased" an additional 10 per cent

H. This "purchase" likewise was funded by a promissory note for $770,000, and lack

$330,000 in cash as a down payment. The source of Jack Michel's cash down payment

sory note, also from Brickyard Bank, guaranteed by Desnick for $330,000. Thus,

both the guarantor and the seller on the transaction, and neither Desnick nor Jack

any risk if Jack Michel defaulted on the note. The United States anticipates that a

pportunity for further investigation and discovery will establish that this purchase was

ction because Jack Michel made no payments on the promissory note for the purchase

Case 1:04-cv-21752-AJ   Document 1   Entered on FLSD Docket 07/16/2004   Page 52 of 81

disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized... shall in the case of such a . . .

concealment or failure ... be guilty of a felony.

87.     Larkin submitted cost reports at all times material to this Complaint.

**B.      The Medicaid Program**

88.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et gg., establishes the Medicaid program. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The United States provides a significant share of the funding for the Medicaid program and also ensures that the states comply with minimum standards in the administration of the program.

89.     Each state must have a single State agency to administer the Medicaid program. 42 U.S.C. § 1396a(a)(5). The Florida Medicaid program is administered by the Agency *for* Health Care Administration (ACHA). In paying hospital claims under Medicaid, Florida relies on Form UB-92s and a modified version of the Medicare cost report forms (Medicaid Cost Reports).

90.     From 1997 until December 31, 1999, the percentage of funds from the Federal Government to the Florida Medicaid Program varied between 50.72% and 58.83%.

91.     The Medicaid Program paid Larkin over $9.79 million from 1997 until December 31, 1999 in response to claims submitted to Medicaid by Larkin. Approximately 50 percent of that $9.79 million paid by Medicaid, or $4.89 million, was federal funds.

## THE SCHEMES

### A. THE 1997 SCHEME: KICKBACKS AND MEDICALLY UNNECESSARY SERVICES

**1.      Ownership of Larkin By Desnick and His Related Corporations**

92.     From March 1, 1997 until at least December 31, 1997, Desnick directly or indirectly through Island, MMA, and HCMA in his alter ego corporations), owned and controlled LCH.  During this time,

Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

78.    The Secretary, acting through *the* fiscal intermediaries, reimburses hospitals in accordance with the Medicare Act and the Secretary's regulations. 42 U.S.C. S 1395h Under the inpatient hospital prospective payment system ("PPS"), hospitals are reimbursed a prospectively determined amount for each discharge. The specific amount paid de²ends on the diagnosis-related group (DRG) which is assigned to the discharge. 42 U.S.C. S 1395(d); 42 C.F.R. S 412A et seq.

79.    Larkin was required to submit annually a hospital cost report to the fiscal intermediary.

80.    During the relevant time period, Medicare payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal *year*. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

81.    Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the rigid to audit the hospital cost reports and financial representations made by Larkin to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(0.

82.    Every hospital cost report contains a "Certification" that must be signed by the chief

services that are "reasonable and necessary." 42 U.S.C. § 1395(a)(1)(A).

72.    To participate in the Medicare program, a hospital must file a provider agreement with the Secretary of MIS (the Secretary). 42 U.S.C. § 1395ec. The provider agreement requires compliance with the requirements that the Secretary deans necessary for participation in the program. Id

73.    Medicare only reimburses for services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury ... 42 U.S.C. § 1395y(a)(1)(A). In submitting Medicare claim forms, including the UB-92, providers must certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.

### (1)    Claims Submitted By Hospitals

74.    To assist in the administration of Medicare Part A, CMS contacts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

75.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims on Form UB-92s for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R §§ 413.1, 413.60, 413.64.

76.    As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly ]mown as the hospital cost report Cost *reports* are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

77.    After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.E.R. § 405.1801(b)(l).

fraudulent 1997 UB-92 forms, and Defendants Jack Michel, LCH, George Michel, Desnick, Palacios, Island, MMA, HCMA, Oceanside and Oracle knowingly submitted or caused to be submitted the false or fraudulent 1997 Larkin Cost Report.

**2.    Kickbacks is Return for Referrals by *the* Larkin Medical Directors and/or Medically Unnecessary Services at Larkin Hospital**

124.   As described more specifically above in ¶¶ 2 – 5, 92 – 94, and 107 -109, the 1997 UB-92s and *the* 1997 Larkin Cost Report were false or fraudulent because they included claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, because the Larkin Medical Directors had entered into prohibited financial relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants LCH, Island, MMA, and HCMA knowingly presented or caused to be presented false UB-92 forms, and Defendants Jack M i t t , LCH, Desnick, Island, MMA, and HCMA knowingly submitted or caused to be submitted the false 1997 Larkin Cost Report.

**B.    The 1998 -1999 Scheme**

125.   As described more specifically above in paragraphs 6 — 8 and 110 — 114, the 1998 -1999 UB-92s and the 1998 — 99 Larkin Cost Reports were false or fraudulent because they included claims for reimbursement for services that were medically unnecessary. Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LEIS LLC, George Michel, Philip Esformes, Moms Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants knowingly presented or caused to be presented false or fraudulent 1998 – 1999 UB-92 forms and the false or fraudulent 1998 – 1999 Larkin Cost Reports.

COUNT 2

VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
AGAINST ALL DEFENDANTS

126.   Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 119.

127.   All Defendants identified more specifically below, knowingly made or caused to be made false statements[7] to get a false or fraudulent claim paid by the United States for payment by the Medicare and Medicaid programs, in violation of the PCA, 31 U.S.C. § 3729 (a)(2).

128.   By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

**A.  False Statements Made as Part of The 1997 Scheme**

**1.     The 1997 Scheme to Pay Kickbacks to Jack Michel and/or Oracle and/or for Medically Unnecessary Services As A Result of Jack Michel's and George Michel's Referrals to Larkin**

129.   As described more specifically above in 2 – 5 and 92 – 106, the 1997 UB-92s and the 1997 Larkin Cost Report were false statement because they included improper claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, because Jack Michel and Oracle had entered into prohibited financial relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants Jack Michel, LCH, George Michel, Palacios, Island, MMA, HCMA, Oceanside and Oracle knowingly presented or caused to be presented false UB-92 forms and Defendants Sack Michel, LCH, George Michel, Desnick, Palacios, Island, MMA, HCMA, Oceanside and Oracle submitted or caused to be submitted the false 1997 Larkin Cost Report.

**2.     Kickbacks in Return for *Referrals* by the Larkin Medical Directors and/or Medically Unnecessary Services at Larkin Hospital**

---

[7] See footnote 5, supra.

130. As described more specifically above in Ti 2 — 5, 92 — 94, and 107 — 109, the 1997 UB-92s and the 1997 Larkin Cost Report were false and fraudulent statements because they included improper claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors because the Larkin Medical Directors had entered into prohibited financial relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants LCI-I, Island, MMA, and HCMA knowingly presented or caused to be presented false UB-92 forms, and Defendants Jack Michel, LCH, Desnick, Island, MMA, and HCMA knowingly submitted or caused to be submitted the false 1997 Larkin Cost Report.   ..      ....

B.    The 1998 -1999 Scheme

131. As described more specifically above in 6— 8 and 110 — 114, the UB-92s and the Larkin Cost Reports for 1998 — 1999 were false and fraudulent statements because *they* included improper claims for reimbursement for services that were medically unnecessary. Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LW, George Michel, Philip Esformes, Morris Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants knowingly presented or caused to be presented false UB-92 forms and the false Larkin Cost Reports for 1998 — 1999.

## COUNT 3

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3) AGAINST ALL DEFENDANTS

132. Plaintiff re-alleges and incorporates herein by reference paragraphs I through)19.

133. All Defendants identified more specifically below, conspired to defraud the United States by getting false or fraudulent claims[8] paid by the Medicare and Medicaid

---

[8] See footnote 5, supra.

130.   As described more specifically above in Ti 2 — 5, 92 — 94, and 107 — 109, the 1997 UB-92s and the 1997 Larkin Cost Report were false and fraudulent statements because they included improper claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors because the Larkin Medical Directors had entered into prohibited financial relationships with <u>Larkin</u>, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants LCI-I, Island, MMA, and HCMA knowingly presented or caused to be presented false UB-92 forms, and Defendants Jack Michel, LCH, Desnick, Island, MMA, and HCMA knowingly submitted or caused to be submitted the false 1997 Larkin Cost Report.    ..      ....

**B.     The 1998 -1999 Scheme**

131.   As described more specifically above in 6— 8 and 110 — 114, the UB-92s and the Larkin Cost Reports for 1998 — 1999 were false and fraudulent statements because *they* included improper claims for reimbursement for services that were medically unnecessary. Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LW, George Michel, Philip Esformes, Morris Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants knowingly presented or caused to be presented false UB-92 forms and the false Larkin Cost Reports for 1998 — 1999.


## COUNT 3

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3) AGAINST ALL DEFENDANTS

132.   Plaintiff re-alleges and incorporates herein by reference paragraphs I through)19.

133.   All Defendants identified more specifically below, conspired to defraud the United States by getting false or fraudulent claims[8] paid by the Medicare and Medicaid

---

[8] <u>See</u> footnote 5, <u>supra</u>.

programs, in violation of the FCA, 31 U.S.C. § 3729 (a)(3).

134.   By virtue of these conspiracies, the United States suffered damages in an amount to be determined at trial.

**A.   Conspiracy re: 1997 Kickbacks For Referrals by Jack Michel and George Michel and/or Medically Unnecessary Services As A Result of Jack Michel's and Genres Michel's Referrals to Larkin**

135.   As described more specifically above in ¶¶ 2 – 5 and 92 – 106, the 1997 UB-92s and the 1997 Larkin Cost Report were false or fraudulent because they included improper claims for reimbursement for services that were (1) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by Jack Michel and George Michel, because Jack Michel and Oracle had entered into prohibited financial relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants Jack Michel, LCH, George Michel, Palacios, Island, MMA, HCMA, Oceanside and Oracle conspired to get the false or fraudulent UB-92 forms paid, and Defendants Jack Michel, LCH, George Michel, Desnick, Palacios, Island, MMA, HCMA, Oceanside and Oracle conspired to *get* the false or fraudulent 1997 Larkin Cost Report paid.

136.   The Defendants identified in the preceding paragraph entered into agreements to have the United States pay false or fraudulent claims by entering into a conspiracy to pay kickbacks to Jack Michel and/or Oracle in return for referrals to Larkin by Jack Michel and George Michel. The specific acts of these Defendants in furtherance of this conspiracy are set forth above in ¶Q 2 — 5 and 92—106.

**C.   Conspiracy re: 1997 Kickbacks For Admissions by the Larkin Medical Directors Medially Unnecessary Services As A Result of the Larkin Medical Director's ʌissions in 1997**

described more specifically above in ¶v 2 — 5, 92 — 94, and 107 — 109, the

1997 UB-92s and the 1997 Larkin Cost Report were false or fraudulent because they included claims for reimbursement for services that were (I) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, in violation of the Anti-Kickback Act; (2) rendered to patients unlawfully referred to Larkin by the Larkin Medical Directors, because the Larkin Medical Directors had entered into prohibited <u>financial</u> relationships with Larkin, in violation of the Stark Act; and/or (3) medically unnecessary. Defendants LCH, Island, MMA, and HCMA conspired to get the false or fraudulent UB-92 forms paid, and Defendants Jack Michel, LCH, Desnick, Island, MMA, and HCMA conspired to get the false or fraudulent 1997 Larkin Cost Report paid.

138.    The Defendants identified in the preceding paragraph entered into agreements to have the United States pay false or fraudulent claims by entering into a conspiracy to pay kickbacks to the Larkin Medical Directors in return for referrals to Larkin by the Larkin Medical Directors. The specific acts of these Defendants in furtherance of this conspiracy are set forth above in ¶¶ 2 — 5, 92 — 94, 107 — 109. Additionally, Krasnow traveled to Miami in *early* 1997 and, with an employee of Larkin, recruited several physicians to admit patients to Larkin in return for medical directorship salaries. Once a physician was recruited, Krasnow, with Desnick's knowledge and approval, would select a position for the doctor to hold at Larkin, and in some instances, the positions were created after the physician was recruited. These physicians did not perform sufficient services that would justify the amounts *they* were paid. Jack Michel joined this conspiracy when he agreed with Desnick to remove from the 1997 Cost Report, inter alia, the payments made to these referring physicians that were disguised as medical directorship salaries without removing any of the claims for medical services for patients admitted by these same physicians.

C.    **Conspiracy re: Claims from 1998 to 1999**

139.    As described more specifically above in ¶¶ 6 — 8 and 110 — 114, the U13-92s and Larkin Cost Reports for 1998 — 1999 were false or fraudulent statements because *they*

included improper claims for reimbursement for services that were medically unnecessary. Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, George Michel, Philip Esformes, Morris Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants conspired to get the false or fraudulent UB-92 forms and the false or fraudulent Larkin Cost Reports for 1998 — 1999 paid.

140.    The Defendants identified in the preceding paragraph entered into agreements to have the United States pay false or fraudulent claims by entering into a conspiracy to seek' reimbursement for services that were not medically necessary. The specific acts of these Defendants in furtherance of this conspiracy are set forth above in 7 6 – 8 and 110 - 114, 138.

## COUNT 4

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(7)
### AGAINST ALL DEFENDANTS

141.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 119.

142.    All Defendants identified more specifically below, knowingly made, used, or caused  to be made or used, a false record[9] to conceal, avoid, or decrease an obligation to pay or transmit money to the United States, in violation of the FCA, 31 U.S.C. § 3729 (0(7). As a result of these false statements made or caused to be made by Defendants, the United States did not seek to recover the funds owned to it by LCH due to the United States' payment of false claims that were made as part of a scheme to pay kickbacks, arose out of improper financial relationships, or were for services that were not medically necessary.

143. By virtue of these false or fraudulent statements, the United States suffered damages in an amount to be determined at trial.

A.    **Larkin Hospital's 1997 Cost Report**

---

[9] See footnote 5, supra.

144. Defendants Jack Michel, LCH, George Michel, Desnick, Palacios, Island, MMA, HCMA, Oceanside, and Oracle knowingly made, used or caused to made or used, a false record, (Ls, here the 1997 LCH Cost Report) in order to conceal, avoid or decrease their obligation to pay or transmit money or property to the United States, i s those funds already paid to LCH for 1997 claims that were made as part of a scheme to pay kickbacks, arose out of improper financial relationships, and/or were for services that were not medically necessary.

**B.      False Claims Contained in Larkin Hospital's Cost Reports for 1998 to 1999**

145. Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, George Michel, Philip Esformes, Morris Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants knowingly made, used or caused to be made or used, a false record (i.e., the LCH Cost Reports for 1998 and 1999), in order to conceal, avoid or decrease their obligation to pay or transmit money or property to the United States, I&., those funds already paid to LCH for claims from January 1, 1998 to December 31, 1999 that were for services that were not medically necessary.

## COUNT 5

## COMMON LAW FRAUD AGAINST ALL DEFENDANTS

146.  The United States incorporates by reference the allegations contained in paragraphs 1 through 119.

147.  All Defendants identified more specifically below, falsely represented the claims[10] to the United States by LCH for payment by the Medicare and Medicaid programs. These Defendants knew that their representations, both direct and implied, that these claims for payment were not pan of a scheme to *pay* kickbacks, arose out of improper financial relationships, and/or were for medically necessary smite, were false.

148.  These misrepresentations were material. Compliance with the Stark Statute and/or the Anti-Kickback Act are conditions of reimbursement. Likewise, the submissions of only those

---

[10] See footnote 5, supra.

claims which are medically necessary is a condition of reimbursement.

149.   Defendants knew that the United States would rely, and intended the United States to rely, on these false representations.

150.   The United States justifiably relied upon these UB-92 false claims and/or false cost reports submitted or caused to be submitted by Defendants for fiscal years 1997, 1998, and 1999 in making reimbursement and interim payments to Larkin

151.   By virtue of Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

152.   The actions of Defendants in submitting false and fraudulent claims and false cost reports to Medicare and Medicaid with the intent that Medicare and Medicaid would rely on these false cost reports and cost statements, was malicious, wanton, and reprehensible conduct. Therefore, punitive damages sufficient to punish and deter these Defendants should be assessed against these Defendants, in an amount to be established at trial.

**A.    1997 Scheme**

**1.    Fraud in Connection with the 1997 Claims and 1997 Larkin Cost Report for Services Rendered in Connection with a Scheme to Pay Kickbacks to Jack Michel and/or Medically Unnecessary Services As a Result of Jack Michel's and George Michel's Referrals to Larkin**

153. In the 1997 UB-92 claims and 1997 Larkin Cost Report, Defendants Jack Michel, LCH, George Michel, Desnick, Palacios, Island, MMA, HCMA, Oceanside, and Oracle falsely misrepresented the nature of those claims, and *falsely* represented that they were fully reimbursable claims,[11] when these Defendants knew that these claims were made as part of a scheme to pay kickbacks, and/or arose from improper financial relationships between Larkin and

---

[11] See footnote 5, supra.

Jack Michel and/Oracle, and/or were for services that were not medically necessary. Defendant Desnick's liability is limited to the 1997 Cost Report.

2.  **Fraud in Connection with the 1997 Claims and 1997 Larkin Cost Report for Services Rendered in Connection with a Scheme to Pay Kickbacks to the Larkin Medical Directors and/or Medically Unnecessary Services As A Result of the Larkin Medical Directors' Referrals to Larkin**

154. In the 1997 UB-92 claims and 1997 Larkin Cost Reports, Defendants Jack Michel, LCH, Desnick, Island, MMA, and HCMA, falsely misrepresented the nature of those claims, and falsely represented that they were fully reimbursable claims, when these Defendants knew that these claims were made as part of a scheme to *pay* kickbacks, arose out of improper financial relationships, and/or were for services that were not medically necessary. Jack Michel's participation in and liability for this fraud is based on his signing the cost report with knowledge that kickbacks were being paid by LCH in 1997. Defendant Desnick's liability is limited to the 1997 Cost Report.

B.  **January 1,1998 to December 31, 1999 Claims and Cost Reports**

155. In the UB-92 claims and cost reports submitted for fiscal years 1998 – 1999, Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, George Michel, Philip Esformes, Moms Esformes, Pace, Palacios, Oracle, and the Retirement Home Defendants falsely misrepresented the nature of those claims, claimin[g] that they were fully reimbursable claims, when these Defendants knew that these claims were for services that were not medically necessary.

## COUNT 6

### PAYMENT BY MISTAKE
### AGAINST DEPENDANTS
### LCH, LCH LLC, GAS INC., and LHS LLC

156. The United States incorporates by reference the allegations contained in paragraphs 1 through 119.

157. For fiscal year 1997, the United States made Medicare and Medicaid payments to Defendants LCH in the erroneous belief that this Defendant was entitled to reimbursement, without knowing that this Defendant's claims were made as part of a *scheme* to pay kickbacks, arose out of improper financial relationships, and/or were for *services* that were not medically necessary. For fiscal years 1998 and 1999, the United States made Medicare and Medicaid payments to Defendants LCH, LCH LLC, LHS Inc. and LHS LLC in the erroneous belief that these Defendants were entitled to reimbursement, without knowing that *these* Defendants' claims were made as part of a scheme to pay kickbacks, arose out of improper financial relationships, and/or were for services that were not medically necessary.

158. The United States' erroneous beliefs were material to the amount of the payments made by the United States.

159. Because of these mistakes of fact, these Defendants received funds to which they were not entitled.

160. By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

**COUNT 7**

**UNJUST ENRICHMENT**
**AGAINST DEFENDANTS JACK MICHEL, LCH, LCH LLC,**
**LHS INC., LHS LLC, DESNICK, ISLAND, MMA, and HCMA**

161. The United States incorporates by reference the allegations contained in paragraphs 1 through 119.

162. For fiscal years 1997, 1998 and 1999, the United States paid to Larkin reimbursements which included non-reimbursable claims which were made as part of a Scheme to pay kickbacks, arose out of improper financial relationships, and/or were for services that were not medically necessary, as a result, these Defendants were unjustly enriched as follows: (1) for fiscal year 1997, Defendants LCH, Desnick, Island, MMA, and HCMA were unjustly enriched by virtue of their direct and/or indirect receipt of reimbursement by Medicare and Medicaid; (2) for fiscal

years 1998 and 1999, Defendants LCH, and Jack Michel were unjustly enriched by virtue of their direct and/or indirect receipt of reimbursement by Medicare and Medicaid.

163. The United States is entitled to the return of all overpayments paid by Medicare and Medicaid to LCH due to the false claims submitted for fiscal years 1997, 1998 and 1999.

164.    By reason of the above-described payments, Defendants Jack Michel, LCH, Desnick, Island, MMA, HCMA, and Oracle, have received money, directly or ind'rectly, to which they were not entitled. They therefore have been unjustly enriched in an amount to be established at trial.

## COUNT 8

### DISGORGEMENT
### AGAINST ALL DEFENDANTS

165.    The United States incorporates by reference the allegations contained in paragraphs 1 through 119.

166.    This is a claim for disgorgement of illegally earned monies from the claims that were made as part of a scheme to pay kickbacks, arose out of improper financial relationships, and/or were not medically necessary, i s , monies which Defendants earned in violation of the False Claims Act, the Stark Act and the Anti-Kickback Act.

167.    This Court, ancillary to the authority conferred on it by Congress under the False Claims Act, the Anti-Kickback Act and the Stark Act, has the equitable power to effectuate Congress' intentions under those Acts among other things, to prohibit payment of kickbacks, payments arising from improper financial relationship, and medically unnecessary services, by ordering the Defendants to disgorge the monies wrongfully obtained by the Defendants.

### PRAYER FOR RELIEF

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

1.      statutory damages in an amount to be established at trial;

2.      civil penalties for each false claim or false statement as provided by law;

3.      the cost of this action, plus interest, as provided by law;

4.      appropriate injunctive relief, including but not limited to remedies under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3001, et seq.; and

5.      any other relief that this Court deems appropriate

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

1.      statutory damages in an amount to be established at trial;

2.      civil penalties for each false claim or false statement as provided by law;

3.      the cost of this action, plus interest, as provided by law;

4.      appropriate injunctive relief, including but  not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.; and

5.      any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against all Defendants, judgment in an amount equal to:

1.      statutory damages in an amount to be established at trial;

2.      civil penalties for each false claim or false statement as provided by law;

3.      the cost of this action, plus interest, as provided by law;

4.      appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.; and

5.      any other relief that this Court deems appropriate.

**AS TO COUNT 4:**

As against all Defendants, judgment in an amount equal to:

1.    statutory damages in an amount to be established at trial;

2.    civil penalties for each false claim or false statement as provided by law;

3.    the cost of this action, plus interest, as provided by law;

4.    appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, at seq.; and

5.    any other relief that this Court deems appropriate.

**AS TO COUNT 5:**

As against all Defendants, judgment be in an amount equal to:

1.    compensatory damages in an amount to be established at trial;

2.    punitive damages;

3.    the cost of this action, plus interest, as provided by law;

4.    appropriate injunctive relief including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.; and

5.    any other relief that this Court deems appropriate.

**AS TO COUNT 6:**

As against Defendants LCH, LCH LLC, LHS Inc., and LHS LLC, judgment in an amount equal to:

1.    the money paid by the United States to these Defendants, plus interest;

2.    the costs of this action, plus interest, as provided by law;

3.    appropriate injunctive relief including but not limited to remedies under the

FDCPA, 28 U.S.C. § 3001, et seq.; and

4.      any other relief that this Court deems appropriate.

**AS TO COUNT 7:**

As against Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, Desnick, Island, MMA, HCMA and Oracle, judgment in an amount equal to:

1.      the money paid by the United States to these Defendants plus interest;

2.      the cost of this action, plus interest, as provided by law;

3.      appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.; and

4.      any other relief that this Court deems appropriate.

**AS TO COUNT 8:**

**As against all Defendants, judgment in an amount equal to:**

1.      Disgorgement of all funds in their possession obtained from the United States; and

2.      appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.

Respectfully submitted,

PETER D. KEISTER Assistant Attorney General

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY
MARK LAVINE
MAGDA LOVJIdSKY
ASSISTANT UNITED STATES ATTORNEYS 99
NE 4¹º Street, Room 326
Miami, Florida 33132-2111
Telephone:          (305) 961-9003
Facsimile:          (305) 530-7139

FDCPA, 28 U.S.C. § 3001, et seq.; and

4.      any other relief that this Court deems appropriate.

## AS TO COUNT 7:

As against Defendants Jack Michel, LCH, LCH LLC, LHS Inc., LHS LLC, Desnick, Island, MMA, HCMA and Oracle, judgment in an amount equal to:

1.      the money paid by the United States to these Defendants plus interest;

2.      the cost of this action, plus interest, as provided by law;

3.      appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.; and

4.      any other relief that this Court deems appropriate.

## AS TO COUNT 8:

**As against all Defendants, judgment in an amount equal to:**

1.      Disgorgement of all funds in their possession obtained from the United States; and

2.      appropriate injunctive relief, including but not limited to remedies under the FDCPA, 28 U.S.C. § 3001, et seq.

Respectfully submitted,

PETER D. KEISTER Assistant Attorney General

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY
MARK LAVINE
MAGDA LOVJldSKY
ASSISTANT UNITED STATES ATTORNEYS 99
NE 4$^{lo}$ Street, Room 326
Miami, Florida 33132-2111
Telephone:        (305) 961-9003
Facsimile:        (305) 530-7139

MICHAEL F. HERTZ POLLY A. DAMMANN
ALICIA J. BENTLEY Attorneys
U.S. Department of Justice Commercial Litigation
    Branch
P.O. Box 261
Ben Franklin Station Washington, D.C. 20044 Tel:
202-616-9854 Fax: 202-514-0280

Case 1:04-cv-21752-AJ   Document 1   Entered on FLSD Docket 07/16/2004   Page 72 of 81

# APPENDIX A

## TO

## UNITED STATES'

## COMPLAINT

| Entity | Shared Common Elements | Alter Egos |
|---|---|---|
| A.D.M.E. Investment Corp. | corporate address: 6865 N. Lincoln Ave. Lincolnwood, IL 60712 <br> director: M. Esformes <br> registered agent: N. Ginsparg | •Moms Esfonnes <br> •ADME Investment Partners, Ltd. |
| A.D.M.E. Investment Partners, Ltd. | corporate address:6865 N. Lincoln Ave., Lincolnwood, IL 60712 <br> partner: A.D.M.E. Investment Corp. (director: M. Esformes) <br> signor of corporate filings: M. Efsotmes <br> registered agent: N. Ginsparg | -Morris Esformes <br> •ADME Investment Corp. |
| ALF Holdings Inc. | corporate address: PO Box 814833, Hollywood, FL <br> officers: M. Esformes <br> registered agent: N. Ginsparg | •Morris Esformes <br> -Philip Esformes <br> -Money, LC |
| Courtyard Manor Retirement Investors, Ltd. | corporate address:6865 N. Lincoln Ave., Lincolnwood, IL 60712 <br> partner: Courtyard Manor Retirement Living, Inc. (director: P. Esformes (1999–2002), J. Michel (1999–2001)) <br> registered agent: N. Ginsparg | •Jack Michel <br> -Morris Esfonnes <br> -Philip Esfonnes <br> Courtyard Manor Retirement Living, Inc. <br> Courtyard Manor Retirement Living, LLC <br> •*Larkin* Health Systems, Inc. |
| Courtyard Manor Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd., Miami, FL 33181 <br> director: P. Esfomtes'(1999–2002); Jack Michel (1999–2001) <br> registered agent: N. Ginsparg | -Jack Michel <br> •Mons Esformes <br> -Philip Esformes <br> Courtyard Manor Retirement Investors, Ltd. <br> Courtyard Manor Retirement Living, LLC <br> •Larkin Health Systems, Inc. |

| | | |
|---|---|---|
| Courtyard Manor Retirement Living, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director. M. Esformes)<br>signor of corporate filings: M. Esformes<br>registered agent: B&C Corp. Service | •Jack Michel<br> Moths Esformes<br>'Philip Esformes<br> Courtyard Manor Retirement Investors, Ltd.<br> Courtyard Manor Retirement Living. Inc.<br>•Larkin Health Systems, Inc |
| Fair Havens Holding Co., LLC | corporate address: 6865 N. Lincoln Ave., Lincolnwood, IL 60712<br>manager: M. Esformes<br>signor of corporate filings: M. Esformes<br>registered agent: N. Ginsparg | 'Morris Esformes<br>-L a n a Health Systems, Inc. |
| Jene's Retirement Investors. Ltd. | corporate address: 6865 N, Lincoln Ave., Lincolnwood, IL 60712<br>partner: Jene's Retirement Living, Inc.<br>signor of corporate filings: P. Esformes<br>registered agent: N. Ginsparg | -Jack Michel<br>-Morris Esformes<br>titre's Retirement Living, Inc.<br>•Jene's Retirement Living LLC<br>·-Larkin Health Systems, Inc. |
| Tene's Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd., Miami, F1 33181<br>director: P. Esformes (2002); J. Michel (1998–2001)<br>incorporator: J. Michel<br>registered agent: N. Ginsparg | •Jack Michel<br>-Philip Esformes<br>•Jcne'a Retirement Investors, Ltd.<br>'font's Retirement Living LLC<br>•Larkin Health Systems, Inc. |
| Jene's Retirement Living, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: Larkin Health Systems, Inc.<br>registered agent: B& C Corp. | 'Jack Michel<br>-Philip Esformes<br>•Jene's Retirement Investors, Ltd.<br>•fen's Retirement Living Inc.<br>•Larldn Health Systems, Inc. |

| | | |
|---|---|---|
| La Covadonga Retirement Investors, Ltd. | corporate address:6865 N. Lincoln Ave., Lincolnwood, IL 60712<br>partner: La Covadonga Retirement Living Inc. (director: P. Esformes (2002); J. Michel (1998–2001)<br>incorporator: J. Michel<br>registered agent: N. Ginsparg | -Jack Michel<br>•Morris Esformes<br>-Philip Esformes<br>•La Covadonga Retirement Living, Inc.<br>-La Covadonga Retirement Living, LLC<br>•Larkin Health Systems, Inc. |
| La Covadonga Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd., Miami, FL 33181<br>director: P. Esformes (2002); J. Michel (1998–2001)<br>incorporator: J. Michel<br>registered agent: N. Ginsparg | 'Jack Michel<br>•Mortis Esformes<br>Philip Esfonnes<br>•La Covadonga Retirement Investors, Ltd.<br>•La Covadonga Retirement Living, LW<br>•Larkin Health Systems, Inc. |
| La Covadonga Retirement Living, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave, Lincolnwood, IL; director: M. Esformes)<br>signor of corporate filings; M. Esformes<br>registered agent: B&C Corp. Service | •Jack Michel<br>'Morris &formes<br>•Philip Esformes<br>•La Covadonga Retirement Investors, Ltd.<br>•La Covadonga Retirement Living, Inc.<br>•Larkin Health Systems, Inc. |
| Larkin Community Hospital LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: M. Esformes<br>signor of corporate filings: M. Esformes<br>registered agent: B&C Corp. Service | •Larkin Health Systems, LLC<br>-Larkin Community Hospital, Inc.<br>-Morris Esformes |
| Larkin Health Systems, LW | corporate address: 201 Curtis Parkway, Miami, FL 33166<br>manager: M. Esformes<br>signor of corporate filings: M. Esformes<br>registered agent Norm Ginsparg | -Fair Haven Holding Co. LLC<br>•Larkin Health Systems, LLC<br>•Larkin Community Hospital, Inc.<br>-Morris Esformes |

| | | |
|---|---|---|
| Morsey, LC | corporate address: 6865 N. Lincoln Ave., Lincolnwood, IL 60712<br>manager: ALF Holdings<br>registered agent: N. Ginsparg | •Morris Esformes<br>•Philip Esformes<br>•ALF Holdings, Inc. |
| The Pointe Retirement Investors, Ltd. | corporate address: 6865 N. Lincoln Ave., Lincolnwood, M 60712<br>partner: The Pointe Retirement Living, Inc.<br>   (director: P. Esformes (2002); J. Michel (1999–2001))<br>fictitious business name: The Pointe of Hialeah<br>registered agent: N. Ginsparg | •Jack Michel<br>-Morris Esformes<br>·Philip Esformes<br>-The Pointe Retirement Living, Inc.<br>-The Pointe Retirement Living, LLC.<br>•The Pointe of Hialeah<br>•Larkin Health Systems, Inc. |
| The Pointe Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd., Miami, FL 33181<br>director: director: P. Esformes (2002); J. Michel (1999–2001)<br>registered agent: N. Ginsparg | •Jack Michel<br>•Morris Esformes<br>•Philip Esformes<br>-The Pointe Retirement Investors, Ltd.<br>-The Pointe Retirement Living, LLC.<br>The Pointe of Hialeah<br>•Larkin Health Systems, Inc. |
| The Pointe Retirement Living, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: Larkin Health Systems, Inc.<br>   (address: 3737 W. Arthur Ave., Lincolnwood, IL; director.<br> M Esformes)<br>signor of corporate filings: M. Esformes<br>registered agent: B&C Corp. | -Jack Michel<br>'Morris Esformes<br>-Philip Esformes<br>•The Pointe Retirement Investors, Ltd.<br>-The Pointe Retirement Living, Inc.<br>-The Pointe of Hialeah<br>•Larkin Health Systems, Inc. |

| | | |
|---|---|---|
| Rainbow Retirement Investors, Ltd. | corporate address; 6865 N. Lincoln Ave., Lincolnwood, IL 60712<br>partner: Rainbow Retirement Living, Inc.<br>   (director: P. Esformes (2002); J. Michel (1999– 2001))<br>registered agent: N. Ginsparg | -Jack Michel<br>•Morris Esformes<br>•Philip Esformes<br>-Rainbow Retirement Living, Inc.<br>-Rainbow Retirement Living, LLC.<br>-The Pointe of Hialeah<br>•Iatkin Health Systems, Inc. |

| | | |
|---|---|---|
| Rainbow Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd.<br>director: P. Esfortnes (2002); J. Michel (1999–2001)<br>registered agent: N. Ginsparg | •Jack Michel<br>•Morris Esformes<br>•Philip Esformes<br>•Rainbow Retirement Investors, Ltd.<br>'Rainbow Retirement Living, LLC.<br>',The Pointe of Hialeah<br>-Larkin Health Systems, Inc. |
| Rainbow Retirement Living, LLC | corporate address: 11190 Biscayne Blvd.<br>manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director: M. Esfonnoa)<br>registered agent B& C Corp. | -Jack Michel<br>'Morris Esformes<br>-Philip Esformes<br>•Rainbow Retirement Investors, Ltd.<br>•Rainbow Retirement Living, Inc.<br>-Larkin Health Systems, Inc. |
| Ridgeway Associates Ltd | business address: 999 Washington Blvd.<br>partner: Maven Retirement Living, Inc.<br>registered agent: M. Wasserman | -Morris Esformes<br>Philip Esfomies<br>-Maven Retirement Living, Inc.<br>-Maven Retirement Investors, Ltd. |
| State Parkway Associates, Ltd. | business address: 999 Washington Blvd.<br>partner: Maven Retirement Living, Inc.<br>registered agent: M. Wassenaan | •Morris Esformes<br>-Philip Esformes<br>-Maven Retirement Living, Inc.<br>•Maven Retirement Investors, Ltd.<br>•Ridgeway Associates Ltd. |
| Williamsburg Ret'rement Investors, Ltd. | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>partner: Williamsburg Retirement Living, Inc. (director P. Esformes (2002), J. Michel (1998– 2001)<br>registered agent: N. Ginsparg | 'Jack Michel<br>•Morris Esformes<br>•Philip Esfonnes<br>-Williamsburg Retirement Living, Inc.<br>•Williamsburg Retirement Living, LLC<br>•Latkia Health Systems, Inc. |

| | | |
|---|---|---|
| Rainbow Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd. director: P. Esfortnes (2002); J. Michel (1999–2001) registered agent: N. Ginsparg | •Jack Michel •Morris Esformes -Philip Esformes •Rainbow Retirement Investors, Ltd. 'Rainbow Retirement Living, LLC. ',The Pointe of Hialeah -Larkin Health Systems, Inc. |
| Rainbow Retirement Living, LLC | corporate address: 11190 Biscayne Blvd. manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director: M. Esfonnoa) registered agent B& C Corp. | -Jack Michel 'Morris Esformes -Philip Esformes •Rainbow Retirement Investors, Ltd. •Rainbow Retirement Living, Inc. -Larkin Health Systems, Inc. |
| Ridgeway Associates Ltd | business address: 999 Washington Blvd. partner: Maven Retirement Living, Inc. registered agent: M. Wasserman | -Morris Esformes Philip Esfomies -Maven Retirement Living, Inc. -Maven Retirement Investors, Ltd. |
| State Parkway Associates, Ltd. | business address: 999 Washington Blvd. partner: Maven Retirement Living, Inc. registered agent: M. Wassenaan | •Morris Esformes -Philip Esformes -Maven Retirement Living, Inc. •Maven Retirement Investors, Ltd. •Ridgeway Associates Ltd. |
| Williamsburg Ret'rement Investors, Ltd. | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL partner: Williamsburg Retirement Living, Inc. (director P. Esformes (2002), J. Michel (1998– 2001) registered agent: N. Ginsparg | 'Jack Michel •Morris Esformes •Philip Esfonnes -Williamsburg Retirement Living, Inc. •Williamsburg Retirement Living, LLC •Latkia Health Systems, Inc. |

| | | |
|---|---|---|
| Rainbow Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd.<br>director: P. Esfortnes (2002); J. Michel (1999–2001)<br>registered agent: N. Ginsparg | •Jack Michel —<br>•Morris Esformes<br>-Philip Esformes<br>•Rainbow Retirement Investors, Ltd.<br>'Rainbow Retirement Living, LLC.<br>',The Pointe of Hialeah<br>-Larkin Health Systems, Inc. |
| Rainbow Retirement Living, LLC | corporate address: 11190 Biscayne Blvd.<br>manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director: M. Esfonnoa)<br>registered agent B& C Corp. | -Jack Michel —<br>'Morris Esformes<br>-Philip Esformes<br>•Rainbow Retirement Investors, Ltd.<br>•Rainbow Retirement Living, Inc.<br>-Larkin Health Systems, Inc. |
| Ridgeway Associates Ltd | business address: 999 Washington Blvd.<br>partner: Maven Retirement Living, Inc.<br>registered agent: M. Wasserman | -Morris Esformes<br>Philip Esfomies<br>-Maven Retirement Living, Inc.<br>-Maven Retirement Investors, Ltd. |
| State Parkway Associates, Ltd. | business address: 999 Washington Blvd.<br>partner: Maven Retirement Living, Inc.<br>registered agent: M. Wassenaan | •Morris Esformes<br>-Philip Esformes<br>-Maven Retirement Living, Inc.<br>•Maven Retirement Investors, Ltd.<br>•Ridgeway Associates Ltd. |
| Williamsburg Ret'rement Investors, Ltd. | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>partner: Williamsburg Retirement Living, Inc. (director P. Esformes (2002), J. Michel (1998–2001)<br>registered agent: N. Ginsparg | 'Jack Michel<br>•Morris Esformes<br>•Philip Esfonnes<br>-Williamsburg Retirement Living, Inc.<br>•Williamsburg Retirement Living, LLC<br>•Latkia Health Systems, Inc. |

| Williamsburg Retirement Living, Inc. | corporate address: 11190 Biscayne Blvd.<br>d'rector: P. Esformes (2002), J. Michel (1998– 2001)<br>registered agent: N. Ginsparg | •Jack Michel<br>-Morels Esformes<br>•Philip Esformes<br>'Williamsburg Retirement Investors, Ltd.<br>-Williamsburg Retirement Living, LLC<br>•Larkin Health Systems |
| --- | --- | --- |
| Williamsburg Retirement Living, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager. Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director. M. Esformes)<br>registered agent: B&C Corp. | 'Jack Michel<br>•Mortis Esformes<br>-Philip Esformes<br>•Williamsburg Retirement Investors, Ltd.<br>'Williamsburg Retirement Living, Inc.<br>•Laddn Health Systems, Inc |

| Larkin Health Systems, Inc. | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>Director: M. Esformes<br>Registered Agent: unknown | -Morris Esformes<br>-Courtyard Manor Retirement Living, LLC<br>-Inter-American Retirement Living, LLC (now Morphil)<br>•La Covadonga Retirement Living, LLC<br>•Morsey LC<br>-The Pointe Retirement Living, LLC<br>-Rainbow Retirement Living, LLC<br>•Williamsburg Retirement Living, LLC |
| --- | --- | --- |
| Maven Retirement Investors, Ltd. | corporate address: 999 Washington Ave., Miami, FL<br>partner: Maven Retirement Living, Inc.<br>registered agent: M. Wasserman | -Morris Esformes<br>-Philip Esfonnes<br>•Maven Retirement Living, Inc.<br>-State Parkway Associates, Ltd<br>•Ridgeway Associates Ltd. |
| Maven Retirement Living, Inc. | corporate address: 999 Washington Ave, Miami, FL<br>officers: M. Esformes & P. Esformes<br>registered agent: M. Wasserman | •Mortis Esformes<br>-Philip Esformes<br>•Maven Retirement Investors, Ltd.<br>•State Parkway Associates, Ltd,<br>-Ridgeway Associates Ltd. |
| Morphil, Inc, | corporate address: 240 East 5th Street, Hialeah, FL 33010<br>director: M. Esformes (1997); P. Esformes (1998—1999, 2002), J. Michel (1998-2001)<br>fictitious business names: Family Health Home; Inter-American Rest Home<br>registered agent: N. Ginsnarg | •Jack Michel<br>*Molds Esformes<br>.Philip Esformes<br>•Family Health Home<br>-Inter-American Rest Home |
| Morphil, LLC | corporate address: 3737 W. Arthur Ave., Lincolnwood, IL<br>manager: Larkin Health Systems, Inc. (address: 3737 W. Arthur Ave., Lincolnwood, IL; director: M. Esformes)<br>signor of corporate filings: M. Esformes<br>registered agent: B&C Corp. | -Moms Esformes<br>•Larkin Health Systems, Inc. |

JS 44
(Rev. 12/96)

**CIVIL COVER SHEET** 04-21752

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Larkin Community Hospital, Inc.
et al.

**DEFENDANTS**

Tim Byrne MAGISTRATE JUDGE for acts
done in his SIMONTON al capacity
as Chief Medicaid Program Integrity
et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

Dade 04- 21752-CIV-Gold (Simonton)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Craig A Brand   305-263-8221
5201 Blue Lagoon Drive #720
Miami Fl 33126

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☒ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **B LABOR** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☒ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party 26 USC 7609 | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | A or B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

42 USC Section 1396, 28 U.S.C. Section 2201-02 and 42 USC §§ 1983

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**  CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $ Undisputed Two time

CHECK YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ___  DOCKET NUMBER ___

DATE 7/14/04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ___  AMOUNT ___  APPLYING IFP ___  JUDGE ___  MAG. JUDGE ___

$150.00   904624
07/16/04